381 A.2d 1295

Franz SCHWARZBACH, Plaintiff,

v.

Perry J. DUNN, Defendant,

v.

JIM BOYLE CHEVROLET, INC. and Jeep Corporation,
Additional Defendants.

Appeal of JEEP CORPORATION.

Robert M. GAYLOR, Administrator of the Estate of
Gunnar R. Gaylor, Deceased,

v.

JEEP CORPORATION, A Corporation, Appellant.

Superior Court of Pennsylvania.

Argued April 12, 1976.

Decided Dec. 28, 1977.

John M. Wolford, Erie, with him R. T. Mutzabaugh, Bradford, for appellant.

John R. Fernan, Ridgway, for appellee at No. 1972.

Norbert J. Pontzer, Ridgway, for appellee at No. 1973.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

WATKINS, President Judge:

Both of these consolidated cases arise out of the same set of circumstances and come to us on appeal from the Court of Common Pleas of Elk County, Civil Division.

On March 27, 1971, Perry J. Dunn, operating the Jeep which was involved in the accident, invited three men friends to ride with him. Dunn and his passengers left the Borough of Ridgway at approximately 8:00 p. m., travelled to other towns in the area, and then finally stopped at a place one and one-half miles south of Ridgway where they remained for a period of approximately two hours. They then proceeded in a northerly direction toward Ridgway on Route 219.

As the Jeep reached the crest of a hill, Dunn, judging his speed to be about 40–45 miles per hour, decided to slow down and attempted to apply the brakes of the vehicle when he found that the brake pedal went to the floor of the Jeep with no braking effect. Dunn then decided to cross to the opposite side of the highway in order to scrape the Jeep

along the steel guardrails on that side to slow the vehicle. Before the Jeep reached the beginning of the guardrails it left the highway, went over an embankment, and collided with trees and brush. One of the passengers in the vehicle, Gunnar B. Gaylor, was fatally injured as a result of the crash. Another, Fred Schwarzbach, was severely injured. The vehicle was damaged extensively. At the time of the incident the roadway was dry and no traffic was approaching from either direction. There were tire tracks leading across the highway and then along the east berm of the place it left the highway. The tire marks were 585 feet in length.

The Jeep had been purchased new by Dunn on March 24, 1971. It was titled in his wife's name.

The case of *Franz Schwarzbach v. Perry J. Dunn and Jim Boyle Chevrolet, Inc.,* the Jeep dealer, and Jeep Corporation is an action in trespass alleging negligence on the part of Dunn, the vehicle's operator. Jim Boyle Chevrolet was later dismissed from this case by mutual agreement of the parties.

The case of *Gaylor v. Jeep Corporation* is an action in trespass alleging a defective product under § 402A of the Restatement of the Law of Torts.

In the *Gaylor* case the jury returned a verdict in favor of the plaintiff in the sum of $20,000.00. The court below awarded the plaintiff a new trial on the issue of damages only upon motion of the plaintiff.

In the *Schwarzbach* case the jury awarded a verdict in favor of the plaintiff in the sum of $600,000 against the Jeep Corporation only. Jeep Corporation is now appealing that case and also the order of the court below awarding a new trial to Gaylor limited to the question of damages only. The lower court had consolidated both cases and they were tried together.

At trial the plaintiffs' position was that the Jeep was dangerously defective because dirt had entered into the brake fluid causing the brakes to fail and that this caused the subsequent crash. Jeep's position was that the brakes

were not defective and that the accident was caused by the operator's intoxicated condition as a blood alcohol test administered to him three hours after the accident indicated a blood alcohol count of .12 and a pathologist would have testified that his alcohol content would have been .18 at the time of the accident using the formula that the alcohol level in one's blood decreases at the rate of .02 per hour. The expert would then have testified that he was driving under the influence of intoxicating liquor. Jeep offered also to prove that in depositions taken of the operator he admitted making four stops with his friends that day and that he had drunk beer at all four stops. Jeep would then have attempted to show either contributory negligence or assumption of risk on the part of the decedent and Schwarzbach for riding with an intoxicated person. However, this proffered testimony never was received by the jury because the court below refused Jeep's offer of proof after a pre-trial conference had been held. Jeep now claims that the court below erred when it denied its offer of such testimony.

Jeep also alleges error in that it was discovered after trial that the husband of a secretary in the law offices of Schwarzbach's counsel had been a member of the jury and had been made foreman of the jury. Jeep claims that this person's presence on the jury is grounds for a new trial as it constituted a denial of a fair and impartial jury. The trial court, after acknowledging its awareness of its right to examine the composition of the jury found nothing about the juror to disqualify him. In his brief appellee Schwarzbach states that the wife of the juror Piccirillo had worked in the offices of his counsel on a part-time basis but goes on to say that she worked for a member of his firm unconnected with this case and that she had no contact with or knowledge of that matter. He also goes on to say that in Elk County there are a number of stenographers who, from time to time, perform services for whatever law offices have need of their services. However, he fails to state whether or not such was the relationship of this individual with the law firm in question.

The only question proposed of the prospective jurors during the voir dire conducted by Jeep's counsel which touches on this matter was the following:

"Do any of you have any reason why you would not serve on this jury and freely pass upon the questions involved here and give a proper verdict based solely upon the evidence which you hear and not being influenced in any way by anything that you have heard about it or by reason of your knowledge of the parties or anything of that nature. What we are trying to do is get a jury that is impartial which I think any of you would desire if you were parties to a law suit, so, if you know of any reason which would prevent you from giving a just verdict solely on the evidence I wish that you would raise your hand?

"(No one raised their hand.)"

No juror indicated an affirmative response to this question. The issue therefore is whether there was an affirmative duty on the juror in question to reveal his wife's relationship with the office of the plaintiff's attorney. We hold that there was.

It is fundamental that a litigant is entitled to a fair trial and that this includes the right to be tried by an impartial jury. *Commonwealth v. Crow*, 303 Pa. 91, 154 A. 283 (1931). However, the law recognizes that it would be unrealistic to expect jurors to be free from all prejudices and it expects merely a mind sufficiently conscious of its sworn responsibility and willing to attempt to reach decisions solely on the facts presented, assiduously avoiding influences of irrelevant factors. *Commonwealth v. Johnson*, 452 Pa. 130, 305 A.2d 5 (1973). There are situations, nevertheless, when a court will presume prejudice on the part of one of the jurors in order to insure fairness. *Commonwealth v. Stewart*, 449 Pa. 50, 295 A.2d 303 (1972). In *Stewart*, supra, a criminal case, the Supreme Court reversed defendant's murder conviction because the father of the victim had been a member of the original jury panel although he did not hear the case and testified that he had not discussed the case with any of the jurors on the panel. In that case the

court addressed itself to the "potentialities" for prejudice taking note of the fact that the victim's father had been in close contact with other members of the jury panel, some of whom eventually heard the case, for a period to two and one-half days. The court considered the fact that a voir dire examination might have revealed and cured any prejudice which could have come about as a result of the association between the victim's father and the jurors but dismissed this argument because the defendant's counsel learned of this fact only after the jury was sworn and thus had no reason to question prospective jurors on voir dire about the situation. Likewise, in our case, Jeep's counsel learned of the possibly prejudicial situation only after the jury had been sworn and had rendered its verdict. And in our case the potential for prejudice was great in that it is quite possible that a secretary in a law office could influence her husband in deciding a matter in which her employer is counsel for one of the parties. The problem here is that it was never factually established just what the secretary's relationship was with the law office of Schwarzbach's attorney. It is admitted in the brief of both parties that at one time Mrs. Piccirillo, whose husband served on the jury, was employed by the law offices of Schwarzbach's attorney. It is implied by one of the parties that she was an occasional employee of many law offices in the area. However, this was never determined as factual. In fact her relationship with the law offices was never made clear anywhere. If she was a mere occasional employee or if a great deal of time had passed since she was so employed the potentialities of prejudice of her husband sitting on the jury would not be great enough to warrant a new trial. However, we do not have the answers to these questions and as the court did in *Stewart*, supra, we are inclined to tip the balance in favor of insuring a fair trial here. We should point out also that the relationship of the juror in this case may have caused Jeep's counsel to exercise a peremptory challenge as to the juror if he had been appraised as to the relationship. Jeep's counsel, however, learned of the relationship only after the verdict had been rendered and as the court stated in *Stewart*, supra,

"thus there was no reason for the defense to question the prospective jurors on voir dire about this inherently prejudicial situation." Because of the potential prejudice here we remand for a new trial generally as to all of the issues.

■■ Because this case must be retried we feel that we should also address ourselves to the issue of the admissibility of the evidence of the operator's indulgence in alcoholic beverages prior to the accident. It is well settled that evidence of drinking on the part of an operator of a vehicle involved in an automobile accident is inadmissible unless the evidence shows a degree of intoxication which proves unfitness to drive. *Billow v. Farmers Trust Co.*, 438 Pa. 514, 266 A.2d 92 (1970); *Fisher v. Dye*, 386 Pa. 141, 125 A.2d 472 (1956). In our case Jeep offered to prove that the operator had been given a blood alcohol test three hours after the accident and that the test revealed a blood alcohol content of .12. Jeep's expert then would have testified that since a person's blood alcohol content decreases after drinking at the rate of .02 per hour and since three hours had elapsed since the time of the accident that his blood alcohol content at the time of the accident was .18 and that he was therefore "driving under the influence". This offer of proof was rejected by the trial court. While we need not decide whether Jeep's offer was sufficient to imply that the operator was unfit to drive at this time in light of the fact that we have reversed on other grounds, we do feel that we should indicate our skepticism of any blood alcohol test that "relates back" to a time earlier than the time the test is made. Alcohol has no effect until absorbed into the bloodstream which occurs from 30 minutes to 90 minutes after consumption. Thus, in the instant case, the operator could have had a blood alcohol test of .12 two and one-half hours after the accident, and have been unaffected in his driving if a great quantity of alcohol had been consumed a few minutes before the accident. In other words we cannot assume that the operator's blood alcohol level ever was as high as .18. It could have been that his blood alcohol level was rising at the time of the test which would be the case if he

had consumed a great quantity of alcohol just before the accident and was the type of person with a slow metabolism. The Legislature has expressly approved of the blood alcohol test as a means of determining whether a person is driving under the influence of intoxicating beverages. A blood alcohol content of .10 or above raises a presumption of intoxication. We feel that this presumption implies that a person with a blood alcohol content of .10 or above is unfit to drive. Otherwise why would driving under such conditions be unlawful? However, we regard with skepticism any evidence with attempts to relate back to a blood alcohol level at a time prior to the administering of such a test because such a test is entirely too speculative. See *Commonwealth v. Hartman*, 179 Pa.Super. 134, 115 A.2d 820 (1955) (Dissenting opinion of Ross, J.)

Because of the fact that the foreman of the jury in both of the consolidated cases was the husband of a secretary in the office of Schwarzbach's attorney, we reverse and remand for a new trial generally in both cases.

SPAETH, J., files a concurring opinion.

PRICE, J., files a concurring opinion in which SPAETH, J., joins.

CERCONE, J., concurs in the result.

HOFFMAN, J., files a dissenting opinion.

PRICE, Judge, concurring:

I concur with the majority that because of the potential prejudice inherent in the presence on the jury of the husband of a secretary in the law offices of counsel for one of the plaintiffs the cases must be tried again. I cannot, however, agree with the majority's discussion of evidence of the operator's indulgence in alcoholic beverages prior to the accident, hence this opinion.

It is Jeep's contention that the lower court erred in refusing to permit expert testimony to establish the driver's intoxication. In *Fisher v. Dye*, 386 Pa. 141, 125 A.2d 472 (1956), the Pennsylvania Supreme Court declared:

". . . while proof of intoxication is relevant where reckless or careless driving of an automobile is the matter at issue, the mere fact of drinking intoxicating liquor is not admissible, being unfairly prejudicial, unless it reasonably establishes a degree of intoxication which proves unfitness to drive." *Id.* 386 Pa. at 148, 125 A.2d at 476.

Because of possible prejudice, the mere fact, standing alone, of consumption of alcohol or testimony that an individual was in a taproom or that he had alcohol on his breath is not admitted into evidence. See *Billow v. Farmers Trust Co.*, 438 Pa. 514, 266 A.2d 92 (1970); *Morreale v. Prince*, 436 Pa. 51, 258 A.2d 508 (1969); *Wentworth v. Doliner*, 399 Pa. 356, 160 A.2d 562 (1960); *Sentz v. Dixon*, 224 Pa.Super. 70, 302 A.2d 434 (1973). These cases have recognized, however, that such facts, when combined with additional proof tending reasonably to establish intoxication, are admissible when relevant.

The relevance of blood alcohol test results to determine intoxication cannot seriously be questioned. The Motor Vehicle Code recognizes the admissibility of chemical analyses of blood and breath. Test results indicating that the amount of alcohol by weight in the blood is .10% or more creates a presumption that a criminal defendant was under the influence of alcohol. 75 Pa.C.S. § 1547(d)(3). The reliability and relevance of blood tests being thus recognized in criminal cases, I deem such evidence equally relevant when the question of intoxication arises in a civil action.

In the instant case, Jeep offered to prove that a blood alcohol test, administered to Dunn three hours after the accident, revealed a blood alcohol content of .12%. Jeep's expert witness would have testified that an individual's blood alcohol content decreases after drinking at the rate of .02% per hour. The expert would also have testified that since three hours elapsed between the time of the accident and performance of the test, Dunn's blood alcohol content when the accident occurred would have been .18%, and Dunn therefore would have been "driving under the influence".

It is a scientific fact that alcohol is absorbed into the bloodstream from 30 minutes to 90 minutes after consumption. Even if the jury believes the expert's proffered testimony that one's blood alcohol content decreases .02% per hour after drinking and that Dunn's content was .12% when tested, they could still conclude that Dunn's blood alcohol content did not peak at .18% at the time of the accident. In other words, Dunn's blood alcohol level may have been increasing rather than peaking when the accident occurred, meaning that he had just consumed a quantity of alcohol minutes before the accident and that it did not affect his driving. This argument debates the weight to be given to the evidence, however, rather than its admissibility. All types of intoxication evidence may be challenged by conflicting evidence. It is the province of the jury to weigh all evidence and to decide the intoxication issue.

At the pretrial conference called to consider the admissibility of intoxication evidence, several supportive facts came to light. Jeep's counsel indicated that a state trooper would testify that on arriving at the scene of the accident, he detected a strong odor of alcohol in the vehicle. In addition, it was brought to the court's attention that the driver testified in a deposition that the group made four stops during their escapade and that the driver drank beer at each stop.

Considering the totality of the proffered intoxication evidence, I find that it could reasonably establish intoxication, thereby overcoming the hurdle of undue prejudice to the defendant, Dunn. While the evidence is not conclusive, it is sufficiently strong to permit the jury to consider it. I would remand for a new trial in both cases, consistent with this opinion.

SPAETH, J., joins this concurring opinion.

SPAETH, Judge, concurring:

I concur in the majority's order of a new trial; also, I join Judge PRICE's concurring opinion.

In his motion for a new trial appellant alleges that "the said Joseph Piccirillo was at the time he was selected as a juror in this case, and is now, the husband of one Alice Piccirillo, the said Alice Piccirillo being at the time that said juror was selected and serving, a legal secretary in the law office of Pontzer and Pontzer, who were at all times the employer of the said Alice Piccirillo." As no response to this allegation appears of record, we should accept it. Accepted, it establishes a sufficiently close relationship to require reversal. *See Commonwealth v. Colon*, 223 Pa.Super. 202, 208, n.8, 299 A.2d 326, 328, n.8 (1972), collecting cases holding that a juror's failure to reveal background that would have been grounds for a challenge for cause or would have provoked a peremptory challenge required reversal and new trial when the juror should have been on notice that the information was called for.

HOFFMAN, Judge, dissenting:

The Majority holds that because of the potential prejudice of one juror, a general new trial is required. I disagree and, therefore, dissent.

Appellant contends that the potential prejudice of one juror resulted in a biased jury and an unfair trial. The potential prejudice alleged is that a member of the jury was the husband of a secretary in the law offices of plaintiff's counsel. Pennsylvania case law is clear that a litigant is entitled to a fair trial which includes an impartial jury. However, Pennsylvania recognizes that jurors are not free from all prejudices: "We can only attempt to have them put aside those prejudices in the performance of their duty, the determination of guilt or innocence. We therefore do not expect a tabula rosa but merely a mind sufficiently conscious of its sworn responsibility and willing to attempt to reach a decision solely on the facts presented, assiduously avoiding the influences of irrelevant factors." *Commonwealth v. Johnson*, 452 Pa. 130, 136, 305 A.2d 5, 8 (1973).

In the instant case two factors lead me to conclude that we should affirm the lower court. Initially, I note that

during voir dire, appellant directed general questions to the potential jurors. He never asked whether any juror had a relationship of any kind with the plaintiff or his counsel. Appellant did direct a question to the jurors which related to any bias they might have. The challenged juror did not indicate that he was predisposed to a particular result or that he had been influenced in any way. In *Commonwealth v. Aljoe*, 420 Pa. 198, 206, 216 A.2d 50, 54 (1966), the Supreme Court stated: " 'The time to challenge is before the juror is sworn; if not exercised then, the right is waived. That waiver may be relieved against when the party affected has been intentionally misled or deceived by the juror or the opposite party' . . . . 'It is the duty of parties to ascertain, by proper examination at the time the jury is impaneled, the existence of any reasons for objection to the jurors.' " In the instant case, there is no allegation or indication that the juror intended to deceive or failed to disclose information which would be prejudicial to appellant. Therefore, I conclude that his presence on the jury cannot be successfully challenged after the jury has been sworn.

Additionally, I believe that the juror's relationship was too remote and inconsequential to require reversal. In *Commonwealth v. Colon*, 223 Pa.Super. 202, 299 A.2d 326 (1972), we held that a challenge for cause should be granted only:

"(1) when the potential juror has such a close relationship, be it familial, financial or situational, with parties, counsel, victims, or witnesses, that the court will presume the likelihood of prejudice; and (2) when the potential juror's likelihood of prejudice is exhibited by his conduct and answers to questions at voir dire." We also stated: "The categories of relationships which automatically call for removal should be limited because it is desirable to have a jury composed of persons with a variety of backgrounds and experiences." *Colon*, supra 223 Pa.Super. at 206, 299 A.2d at 327. In *Commonwealth v. Stewart*, 449 Pa. 50, 295 A.2d 303 (1972), after the jury was sworn, defense counsel discovered that the father of the murder victim was on the panel of jurors from which the trial jury had been selected. The Supreme Court reversed the conviction because the inherent prejudice

in the association with the panel members rendered impartiality impossible. In the instant case, the Majority relies upon *Stewart* to find inherent prejudice in the juror's relationship. I believe that under *Colon*, we should look to the nature of the relationship to determine the potential for prejudice. The case at bar involves the husband of a conceivably part-time stenographer [1] who worked in the law offices of appellee's attorney. This relationship is vastly different from that in *Stewart*. In fact, I believe the connection between the challenged juror and the appellee is so remote and tangential that I would find that no new trial is required.

Consequently, I dissent.

---

1. Appellee alleged in its brief that the stenographer was only part-time. There was no finding of fact on this issue.