Susan E. **CLEMENT**, Administratrix ad Prosequendum of the Estate of Thomas Allen Clement, Deceased, Individually and as Legal Guardian for and on Behalf of Matthew Gordon Clement and Elizabeth Anne Clement, Minor Children, Plaintiff,

v.

**CONSOLIDATED RAIL CORPORATION**, Pennsylvania Truck Lines, Inc., American President Lines, Inc., Theurer, Inc., and John Does 1 Through 10, Defendants.

Civ. A. No. 88–3793(CSF).

United States District Court, D. New Jersey.

Jan. 3, 1990.

Nicholas R. Perrella, Picco Mack Kennedy Jaffe Perrella & Yoskin, Trenton, N.J., for plaintiff.

Peter R. Freed, Smith, Stratton, Wise, Heher & Brennan, Princeton, N.J., for defendant, Pennsylvania Truck Lines, Inc.

Samuel D. Lord, Connell, Foley & Geiser, Roseland, N.J., for defendant, Consolidated Rail Corp.

James G. Gardner, Carpenter, Bennett & Morrissey, Newark, N.J., for defendant, American President Lines.

## OPINION

FREDA L. WOLFSON, United States Magistrate.

Plaintiff seeks to recover damages resulting from the death of Thomas Allen Clement. The decedent, an employee of Pennsylvania Truck Lines (hereinafter "PTL"), was fatally injured when the vehicle he was driving collided with an American President Lines' (hereinafter "APL") chassis at Consolidated Rail Corporation's (hereinafter "Conrail") South Kearny trail-van yard.

Presently before the Court is plaintiff's motion *in limine* for an Order to preclude or otherwise bar the defendants from introducing evidence, whether testimonial or documentary, which refers or relates to the prior use of controlled dangerous substances by the decedent, at any time prior to and including the time of his fatal accident. Plaintiff also seeks to preclude the defendants from offering any evidence of the use or consumption of alcohol at any time prior to and including the time of Thomas Clement's fatal accident, or evidence of his blood alcohol level as revealed by an autopsy.

There are three issues which this Court must resolve: (1) whether evidence of decedent's use of alcohol and his levels of blood alcohol at the time of his death are relevant and admissible in light of New Jersey's supplemental evidence requirement, (2) whether evidence of decedent's use of alcohol and his blood alcohol content are admissible as evidence of violations of defendants', Conrail/PTL, work rules, and (3) whether evidence of decedent's prior drug use is relevant and admissible on the question of decedent's prospective earning capacity.[1]

## FACTS

Decedent, Thomas Allen Clement, had been employed by PTL for a period of twelve years and at the time of his death was the terminal superintendent at the Conrail Trailvan Terminal in South Kearny, New Jersey. On October 29, 1987, Clement was scheduled to work the 3:00 P.M. to 11:00 P.M. shift. After completing more than half of his shift, decedent, while driving a 1987 pickup truck on a macadamized pad area between Tracks D and E, collided with an APL truck chassis parked on the south side of the roadway. Following the initial impact, decedent's vehicle travelled 102 feet in a northwest direction and then struck the left front of another parked APL chassis.[2] Mr. Clement was pronounced dead several hours later.

There were no eyewitnesses to the fatal accident. Police Officer Cinardo and Detective Rutan of the South Kearny Police Department were dispatched to the scene, along with Conrail police, the Kearny Volunteer Emergency Rescue Squad and the Emergency Medical Rescue Unit No. 6 from Clara Maas Hospital. Police Officer Cinardo has testified in a deposition that, upon arriving at the scene, he noticed that the chassis first struck by decedent had sustained significant damage and, apparently, by virtue of the force of the impact, had been moved approximately two and a half feet southwest.

The following day, Dr. Geetah Natarajan, Assistant State Medical Examiner, performed a *post mortem* examination which included an autopsy on the deceased. The autopsy report revealed that Mr. Clement's blood alcohol level was .051, with alcohol levels of .717 and .040 found in the stomach and in the brain, respectively. The report also revealed the presence of Lidocaine, a substance which defendants contend is widely used as a cutting agent for cocaine. However, the autopsy tests for controlled substances or any of their by-products were negative.

## I.

▮ The first issue facing this Court is whether any evidence of decedent's use of alcohol, prior to or at the time of the accident, including the presence of alcohol found in decedent's body, should be admissible at the liability phase of trial, or whether it is so prejudicial that it should be excluded. In deciding this issue, this Court

1. The parties appear to agree that these issues can be resolved at this time by motion *in limine*. Fact discovery is complete. Ruling on the admissibility of this evidence in the context of this application, rather than at trial is both desirable and appropriate. As shown by the papers and argument presented here, the *in limine* procedure permits more thorough briefing and argument than would be likely if the proceedings were deferred. See 21 C. Wright & K. Graham, *Federal Practice and Procedures: Evidence,* sec. 5037 at 194–95 (1977); *State v. Whitehead Bros., Co., Inc.,* 210 N.J.Super. 359, 364, 509 A.2d 832 (Law Div.1986). A decision on these motions now is far more efficient than delaying consideration until trial. *See Cipollone v. Liggett Group, Inc.,* 644 F.Supp. 283, 285–87 (D.N.J. 1986). An immediate determination has the potential for facilitating settlement or reducing trial time and confusion on substantial issues.

2. According to Conrail, trains arrive and depart the yard where the accident occurred. The containers which are connected by the trains are then lifted on or off specialized railroad cars where they are prepared for delivery. In accordance with a Terminal Services Agreement between PTL and Conrail, PTL is responsible for the loading and unloading of the containers. Chassis are pulled alongside these specialized railroad cars and depending upon the procedure employed are then placed at an angle or parallel. It was decedent's responsibility to supervise the PTL employees who loaded and unloaded these containers to and from the train. It appears that decedent was en route to performing his duties when the crash occurred.

must apply New Jersey state law. *See Rovegno v. Geppert Brothers, Inc.*, 677 F.2d 327, 329 (3d Cir.1982), (in cases brought under diversity jurisdiction, the admissibility of prejudicial evidence is to be decided in accordance with the laws of the state where the district court sits).

■ Under New Jersey law, although evidence of intoxication may be relevant to the issue of negligent driving, the admissibility of such evidence is nonetheless limited to situations where the proponent of the evidence can demonstrate by supportive evidence that the driver's consumption of alcohol had indeed affected the safe operation of his vehicle. *Gustavson v. Gaynor*, 206 N.J.Super. 540, 545–46, 503 A.2d 340 (App.Div.1985), *cert. denied*, 103 N.J. 476, 511 A.2d 655 (1986).[3] To allow the admission of evidence of alcohol consumption, without supplementary evidence to support the inference of unfitness to drive, would be unduly prejudicial given its ability to inflame the jury. *Id.* at 545, 503 A.2d 340.

Thus, this Court must determine whether the evidence demonstrates an unfitness to drive sufficiently clear that the probative value of Clement's drinking outweighs its potential for unfair prejudice. *Gustavson*, 206 N.J.Super. at 546, 503 A.2d 340, *citing Rovegno*, 677 F.2d at 331. Defendants Conrail and PTL[4] contend that the facts present here provide the required supplementary evidence to establish that decedent was so impaired that he was unfit to drive.

■ In deciding this motion *in limine*, it is incumbent upon this Court to examine the underlying facts. Where there is a preliminary question of fact to be decided before evidence may be admitted, the burden of proving that fact rests upon the proponent of the evidence. *Kasiski v. International Paper Co.*, 58 N.J.Super. 353, 370, 156 A.2d 273 (1959) (Freund, J. dissenting), *rev'd*, 31 N.J. 267, 269, 157 A.2d 1 (1959) (adopting dissent); *See also Kalkowski v. Ronco, Inc.*, 424 F.Supp. 343, 353 (N.D.Ill.1976); *See generally* 1 Wigmore, *Evidence*, Sec. 17, n. 20 (Tillers rev.1983). Since it is the defendants who seek to introduce the evidence, they carry the burden of proving the existence of such facts, or risk an adverse finding. *See, Lightner v. Cohn*, 76 N.J.Super. 461, 469, 184 A.2d 878 (App.Div.), *cert. denied*, 38 N.J. 611, 186 A.2d 308 (1962).

First, defendants contend that decedent's drinking, together with the opinion of defense toxicologist, Dr. Snyder, leads to the inescapable conclusion that the decedent was so impaired that he was unfit to drive. Defendants assert that decedent's blood alcohol level of .051 establishes that the decedent consumed alcohol shortly before his accident. Defendants buttress this conclusion by alleging that empty beer cans were removed from the truck decedent was driving[5], that a fellow employee had smelled

---

3. The *Gustavson* court relied on the well-established Pennsylvania case law in this area. This Court also looks to these sister state decisions, and their predecessor cases, as persuasive authority. *See Critzer v. Donovan*, 289 Pa. 381, 137 A. 665 (1927); *Fisher v. Dye*, 386 Pa. 141, 125 A.2d 472 (1956); *Harvey v. Doliner*, 399 Pa. 356, 160 A.2d 562 (1960); *Cook v. Philadelphia Transportation Co.*, 414 Pa. 154, 199 A.2d 446 (1964); *Vignoli v. Standard Motor Freight, Inc.*, 418 Pa. 214, 210 A.2d 271 (1965); *Morreale v. Prince*, 436 Pa. 51, 258 A.2d 508 (1969); *Billow v. Farmers Trust Co.*, 438 Pa. 514, 266 A.2d 92 (1970); *Commonwealth v. Cave*, 219 Pa.Super. 512, 281 A.2d 733 (1971); *Sentz v. Dixon*, 224 Pa.Super. 70, 302 A.2d 434 (1973); *Kriner v. McDonald*, 223 Pa.Super. 531, 302 A.2d 392 (1973); *Selby v. Brown*, 250 Pa.Super. 134, 378 A.2d 862 (1977); *Schwarzbach v. Dunn*, 252 Pa.Super. 454, 381 A.2d 1295 (1977); *Cusatis v. Reichert*, 267 Pa.Super. 247, 406 A.2d 787 (1979);

*Couts v. Ghion*, 281 Pa.Super. 135, 421 A.2d 1184 (1980).

4. Defendant APL, by way of letter, simply joins in the arguments of Conrail and PTL.

5. Conrail asserts that pursuant to an investigation conducted by PTL, they discovered in the accident vehicle: one empty 16 oz. Budweiser can on the floor; two empty 12 oz. Molson Light beer cans and two empty 12 oz. Budweiser cans underneath and behind the passenger seat on the floor; and the following morning, a further inspection revealed an empty 12 oz. Budweiser beer can behind the driver's cab in the bed of the truck. Conrail further alleges that Conrail Police investigator Paulich, in connection with his undercover investigation, learned from Mike Stecz, a PTL employee, that Stecz was at the scene of the accident before police had arrived, and in an effort to prevent

alcohol on Clement's breath on previous occasions, and that on the night of the accident, Clement drank something stronger than just beer.[6]

However, no evidence has been proffered to establish the presence of a noticeable smell of alcohol on Clement's breath at or near the time of the accident. Instead, defendants submit the deposition of PTL supervisor, Jerome McCormick, who testified that on *previous* occasions he had smelled alcohol on Clement's breath.[7] Importantly, there is no testimony from the officers dispatched to the accident scene, or anyone else in close proximity to Clement prior to his death, that there was any odor of alcohol about him.

In contrast, plaintiff relies on the deposition of Daniel Butler, who states that he did not smell alcohol on Clement's breath or notice any physical signs that Clement may have been impaired, despite conferring with Clement from a distance of three to four feet, only 45 minutes before the accident. (Butler Dep., T–52–54).

Clement's family from learning that Clement was drinking when he was killed, Stecz removed some beer cans from the truck. The amount of cans Stecz allegedly removed is not identified, but he claims it took him two trips to remove the cans. However, Conrail fails to offer any proof in the form of affidavit or testimony from either Paulich or Stecz to confirm these allegations. Defendant PTL alleges that PTL Terminal Superintendent Allen Elmadolar will testify that he searched decedent's vehicle the following day and discovered an empty beer can. Although PTL does provide the deposition of Officer Cinardo to confirm that "some Budweiser cans and Molson empties were found on the rear seat of the vehicle" (Cinardo Dep., T36–L3–4), there is no identification of the exact number of beer cans found, nor is there any accounting of what became of these cans. Furthermore, there is no indication that Clement was the only driver of that vehicle on the day in question or how often the truck was cleaned after use.

In contrast, plaintiff has supplied the Court with the depositions of John Cerrone and Daniel Butler, who were at the scene shortly after the accident occurred. Both Cerrone and Butler stated that to their knowledge no one removed beer cans from decedent's truck. While these depositions do not preclude the possibility that beer cans were removed by Stecz, they at least provide the Court with sworn testimony, rather than the rank hearsay defendants present here.

The Court is suspect of the form and manner in which defendants support their allegations. With rare exception, defendants' contentions are based on unsubstantiated, unsworn, and contradicted statements, or hearsay. At most, defendants have established what plaintiff already concedes—that Thomas Clement consumed alcohol on the night of his fatal accident. But mere consumption of alcohol cannot be equated with an unfitness to drive. *See Gustavson,* 206 N.J.Super. at 545, 503 A.2d 340, relying on *Ballard v. Jones,* 21 Ill. App.3d 496, 316 N.E.2d 281, 286 (1st 1974); *Billow v. Farmers Trust Company,* 438 Pa. 514, 266 A.2d 92 (1970).

In *Billow,* the court excluded evidence of decedent's blood alcohol content, despite defendant's proffered medical evidence that a person with a blood alcohol content of .14 percent would be so impaired that his driving skills would naturally be affected. *Id.* 266 A.2d at 93. Similarly, the court in *Rovegno* refused to allow defendants' expert to testify that a blood alcohol level of .158 percent would have

6. Conrail alleges that another PTL employee, Dennis Clearly, informed investigator Paulich that Clement usually carried a flask of Dewar's Scotch with him. Furthermore, according to the report filed by A.T. Dunn, Chief Inspector of Conrail Police, he was advised by Dr. Geetha Natarjan, Assistant State Medical Examiner, that the percentage of ethyl alcohol found in decedent's stomach indicates that something stronger than beer was consumed.

However, no competent offer of proof for Clearly's statement was submitted, no flask was found on decedent or in his vehicle, nor did Mr. Clearly state that decedent carried a flask on the day of his accident.

7. In his deposition, Jerome McCormick admitted that he never actually observed Clement drink while on the job, but was told by others that they suspected he drank. McCormick did testify that on previous occasions he had detected alcohol on Clement's breath (McCormick Dep., T74–L23, T95–L14–17), but that on the night of the accident, he had only heard from another supervisor that Clement had been drinking. (T80–L11–18). Again, defendants' offers of proof are either irrelevant or incompetent forms of evidence—the statements are either irrelevant because they do not relate to the night in question or incompetent because they are hearsay.

made the driver unfit to drive. *Rovengo,* 677 F.2d at 328. This court too, is unwilling to infer that one is unfit to drive based solely on one's blood alcohol level—even when that level is extremely high. Certainly such an inference is unwarranted here, particularly where Clement's blood alcohol level was scarcely one third that found in the drivers in *Billow* and *Rovegno* and well below the level of legal intoxication of .10 percent in New Jersey.[8]

Since mere consumption of alcohol is insufficient to establish an unfitness to drive, defendants point to three additional facts, which they contend, provide supplemental evidence of Clement's unsafe operation of his vehicle: (1) excessive speed, (2) reckless driving, and (3) the failure to recognize objects as evidenced by the absence of skid marks.[9] The Court is guided by the flexible position taken in *Rovegno* and embraced by *Gustavson* that

> [w]hile there can be no rigid standard for categorizing the various maneuvers which might be classified as erratic operation of a motor vehicle in order to qualify as the necessary supplementary evidence, the controlling consideration is whether 'the evidence and offers of proof present a picture of unfitness to drive sufficiently clear that that probative value of the evidence of drinking or intoxication outweighs its potential for unfair prejudice.'

*Gustavson,* 206 N.J.Super. at 546, 503 A.2d 340; *quoting Rovegno,* 677 F.2d at 331. Several of the factors which courts have relied upon to determine whether a driver was unfit to drive include, excessive drinking, driving at an excessive speed, reckless or erratic driving, and drunken behavior at the accident scene. *Gustavson,* 206 N.J. Super. at 545, 503 A.2d 340, *citing, Rovegno,* 677 F.2d at 330–31.

Here, defendants assert, first, that the decedent's vehicle was traveling at an excessive speed. The posted speed limit in the Conrail terminal is 15 m.p.h. Plaintiff's own engineering expert, Dr. Ira Kuperstein, and Officer Cinardo have estimated that, at the time of the initial impact, the decedent was driving between 30 and 40 m.p.h. Plaintiff does not dispute that decedent was driving at this speed, but contends that such a speed was not excessive.

It is plaintiff's position that the 15 m.p.h. speed limit was never enforced, and that it would be impossible for a supervisor to get his work done on time if he were to drive at the posted speed. Once again, although defendants carry the burden of proof, it is the plaintiff who provides the evidence to contradict defendants' allegations. Plaintiff proffers the deposition testimony of Herbert Sakow, PTL's former South Kearny Terminal Manager, Daniel Butler, PTL's Supervisor at South Kearny at the time of the accident, and PTL Supervisor, Jerome McCormick. All three testified that the 15 m.p.h. speed limit was not enforced. McCormick added that on the infrequent occasions that Conrail police did enforce the speed limit, it was only against outside drivers, not employees of the yard. In fact, Officer Cinardo testified that on the night of the accident, he had clocked drivers on his radar, traveling 35 to 40 m.p.h. throughout the terminal.

Moreover, plaintiff asserts that decedent's speed of 30 to 40 m.p.h. was necessary in order to abide by the time schedules set by Conrail. Both Butler and McCormick testified that they drove at speeds of up to 40 m.p.h. in order to perform their jobs timely. Accordingly, while it is true

---

8. See *N.J.S.A.* 39:4–50. Pennsylvania has also adopted the .10 percent presumption. The courts of that State are now giving greater consideration to admitting evidence of substantially elevated blood alcohol levels (levels in excess of .10 percent) on the question of unfitness to drive. *See Couts v. Ghion,* 281 Pa.Super. 135, 421 A.2d 1184, 1189 (1980); *Cusatis v. Reichert,* 267 Pa.Super. 247, 406 A.2d 787, 789–90 (1979); *Schwarzbach v. Dunn,* 252 Pa.Super. 454, 381 A.2d 1295, 1298 (1977). Despite this trend, Clement's blood alcohol level was well below the .10 percent level, and would not run afoul of this development.

9. There were no eyewitnesses to decedent's manner of driving or the accident itself. Therefore all of the proffered evidence of decedent's driving is based upon expert reports, opinions of the investigating police officer and the deductive theories of counsel.

that decedent had been driving in excess of the posted speed limit just before he collided with the chassis, the Court cannot find that the speed at which he was traveling was excessive. To the contrary, given the time constraints Conrail imposed upon its employees, the evidence indicates that Conrail gave its tacit approval to such speeding, and that decedent's driving was accepted under the circumstances and does not portray an unfitness to drive.

As a second basis for their claim of decedent's unfitness to drive, defendants allege that Clement drove in an erratic or reckless manner. Defendants rely on the report of their engineering expert to maintain that decedent drove to the left of center of the paved area, although he had at least 30 feet of clear space to the right of the first chassis he struck. Defendants theorize that since decedent was familiar with the terminal and the storage of the chassis, his election to drive to the left of the center was reckless since it greatly increased the chances of an accident.

However, plaintiff asserts that the presence of parked chassis on the right hand side presented a hazardous condition, and thus, contrary to defendants' position, it was actually safer to drive in the manner chosen by decedent. PTL Supervisor McCormick supports plaintiff's position. He states that "it was much safer for a supervisor who was traveling west on Track D to stay as far to the left of these bare chassis as possible." (McCormick Affid., p. 2).

It is possible that decedent's decision to drive closer to the left of the center may have increased the likelihood of an accident. However, this Court cannot find that defendants have sufficiently shown through this fact alone that decedent's driving was reckless. Merely driving off-center through an obstacle course of randomly parked chassis in a terminal does not constitute recklessness. See Gustavson, 206 N.J.Super. at 546, 503 A.2d 340 ("the veering of two or three feet out of one's lane while driving on a curving road at night is not so erratic as to suggest that the driver was probably intoxicated").[10]

Defendants additionally argue that the absence of any skid marks prior to or after the initial impact indicates that the decedent made no effort to avoid the parked chassis, and thus, was reckless. Defendants imply that the decedent was so impaired that he was unable to recognize the chassis and change course. However, plaintiff suggests a different theory to explain the absence of skid marks. They contend that the dark color of the bare chassis, combined with the poor lighting on Track D, made the chassis virtually impossible to see.

Defendants offer an engineering expert report to confirm that there was sufficient distance and opportunity for the decedent to perceive the chassis and timely apply the brakes. In contrast, plaintiff has produced countless witnesses who have testified that the lighting at Track D is poor. Additionally, APL has admitted that the chassis struck by decedent was a dark color. Thus, the inference that Clement was unable to stop or change course because he was impaired is pure speculation.

The mere fact that decedent consumed alcohol and at some point in time thereafter crashed his vehicle into a stationary object does not lead to a conclusion of recklessness. In *Rose v. Brozman's Tavern, Inc.*, 102 Ill.App.3d 1087, 58 Ill.Dec. 340, 430 N.E.2d 282 (1981), cited approvingly in *Gustavson*, the court refused to find that the driver, who had consumed several drinks and had been speeding, was reckless when his car failed to negotiate a curve and flew into a bridge. The *Rose* court stated,

---

**10.** Also, decedent was driving through a terminal and not a public roadway. Speeding on the wrong side of a public road bears the clear risk of catastrophic results from oncoming traffic. See *Greiner v. Volkswagenwerk Aktiengesellschaft,* 540 F.2d 85, 90 (3d Cir.1976); *Commonwealth v. Cave,* 281 A.2d at 734–35. (where the court found that the driver who had sped on an unknown road, rural in character, and had ignored a cautionary warning from one of the passengers familiar with the road, drove in a reckless and erratic manner). The same risks do not inhere in a railroad terminal, and indeed, there is testimony that Clement chose the safer course by traveling to the left of center of the chassis. See *(McCormick* Aff., p. 2.)

"[a] miscalculation with regard to speed or braking could easily result in failure to negotiate an 'S' curve by a sober person or by a person not inebriated to the extent of intoxication, even though he had previously consumed alcohol." *Rose*, 58 Ill.Dec. at 344, 430 N.E.2d at 286. Similarly, the fact that Clement was unable to avoid a collision with a chassis, which might not have been easily visible, does not lead to the conclusion that Clement was driving erratically or recklessly. In fact, McCormick testified that near misses and collisions with bare chassis occur frequently at the terminal. (McCormick Dep., T–52–53). Accordingly, this Court cannot conclude that the manner in which Clement drove his vehicle was reckless in the context of an "unfitness to drive" standard. *But see*, n. 11, *infra*.

Finally, although the defendants rely heavily on *Cusatis v. Reichert*, 267 Pa.Super. 247, 406 A.2d 787 (1979), the facts here are clearly distinguishable from those in *Cusatis*. The court there ruled that sufficient supplemental evidence of an unfitness to drive had been produced where: the driver had an elevated blood alcohol level of .14 percent, the first police officer on the scene testified that there was an odor of alcohol about the driver and his walk was rather poor, the driver pled guilty to a charge of reckless driving and he admitted to drinking during the evening. *Id*. 406 A.2d at 788. The court was influenced by the driver's high blood alcohol level, since under the Pennsylvania state statute, intoxication could be presumed for a blood alcohol level over .1 percent. But *Cusatis* was not simply a case of a high blood alcohol level. It was this fact, together with additional competent evidence provided by the police officer and the driver himself, which decided the case. Thus, *Cusatis* must be distinguished from *Billow*, *supra*, where a .14 blood alcohol level was present, but the evidence of drinking was excluded be-

cause no other supplementary evidence was produced. *Id*. 406 A.2d at 790.

Here, Clement's blood alcohol level was one third that of the driver in *Cusatis* and does not rise to a level of legal intoxication under New Jersey law. Furthermore, there is no testimony or evidence which suggests intoxication or impairment prior to or at the scene of the accident. Whereas, the issue of recklessness was conceded by the driver in *Cusatis*, here it is not only disputed, but the decedent's alleged "irregular" driving is explained as ordinary. While it is not this Court's view that the defendants here must establish each of the factors found in *Cusatis*, defendants fall short in every respect.

New Jersey's relatively recent adoption of the policy outlined in *Gustavson*, should not be cast aside by way of judicial fiat simply because counsel contend it is now outdated. It is evident that the New Jersey courts find it imperative to prevent prejudice to the plaintiff which might arise from the introduction of evidence of alcohol consumption. This is accomplished by linking the admission of such evidence with an "unfitness to drive" standard. That has not been accomplished here.

In summary, defendants provide unsupported allegations, conjecture and speculation for an evidentiary decision that requires competent supportive evidence.[11] Although the Court does not condone the decedent's driving of his vehicle with a .051 blood alcohol reading, defendants have simply failed to meet the necessary burden of proof to admit such evidence. Consequently, plaintiff is able to satisfy the burden required under *Evid.R*. 4 of showing that the probative value of defendants' evidence is substantially outweighed by the undue prejudice that would result. Under the binding precedents, defendants' failure to provide supporting evidence to show an unfitness to drive, constrains the Court to conclude that evidence of alcohol consump-

11. This decision does not preclude defendants from establishing comparative negligence by reference to Clement's manner of driving. The defendants are free to attempt to prove their theory of contributory negligence by showing

that Clement made the choice of driving to the left of the center, that he failed to apply his brakes, or that he failed to abide by the speed limit.

tion is unduly prejudicial, *per se. Gustavson*, 206 N.J.Super. at 545, 503 A.2d 340.

## II.

■ Defendants submit that Clement's consumption of alcohol on the job violated the companies' safety rules, and that evidence of this fact is admissible on the question of decedent's comparative negligence. Defendants contend that since this evidence would be offered in the context of the work rule violation, the policy concerns and requirements for admissibility of evidence of drinking and driving that are expressed in *Gustavson* are inapplicable. The question of whether these same standards should apply to a work rule violation is one of first impression.

The work rule in question is found in PTL's "Welcome To" handbook which is issued to all of its employees. The rule prohibits "[p]ossession, selling or using alcohol or drugs on Company property or reporting for or returning to work when ability is impaired by use of alcohol or drugs." (PTL Handbook, p. 14). In addition, Conrail Rule 1100/PTL Rule 10032,[12] which basically reiterate the anti-alcohol policy found in the PTL handbook, state: "[t]he use or possession of intoxicants or narcotics by employees reporting for duty or while on duty or while on company property is prohibited."

Plaintiff's counsel argues that there was no violation of the PTL Handbook Rule since defendants are unable to show that Clement was impaired. However, plaintiff focuses only on the "impairment" section of the rule, and ignores the "possession" or "use" aspects. Clement reported for work several hours before his fatal accident, yet his blood alcohol level at death would indicate that he had possessed and consumed alcohol either before reporting for duty or while on duty or while on company property. *See* Conrail Rule 1100/PTL Rule 10032. There is also at least some evidence that there were empty beer cans removed from decedent's vehicle after his death. Thus, it is a fair assumption that Clement did violate defendants' anti-alcohol rule on the day of his accident.

■ The failure to comply with a company rule is generally relevant as evidence of whether the employee has exercised due care in the performance of his job. *Marks v. Mobil Oil Corp.*, 562 F.Supp. 759, 769 (E.D.Pa.1983), *aff'd mem.*, 727 F.2d 1100 (3d Cir.1984); *See also* 57A Am.Jur.2d *Negligence* § 187 (1989). However, unlike the violation of a state statute, failure to comply with a company rule cannot constitute negligence *per se. See Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 820 (6th Cir.1981); *Teets v. Chicago, South Shore & South Bend Railroad*, 238 F.2d 223, 226 (7th Cir.1956). If evidence of the violation is ruled admissible, the issue is then submitted to the jury to decide whether the violation of the rule was the proximate cause which contributed in part or in whole to the accident. *Teets*, 238 F.2d at 226; *Illinois Central Railroad Co. v. Andre*, 267 F.2d 372, 374 (5th Cir.), *cert. denied*, 361 U.S. 820, 80 S.Ct. 65, 4 L.Ed.2d 65 (1959); *Marks v. Mobil Oil Corp.*, 562 F.Supp. at 770; *Christner v. E.W. Bliss Co.*, 524 F.Supp. 1122, 1124–25 (M.D.Pa. 1981).

The controlling question for this Court is whether the prejudicial impact of evidence of this work rule violation substantially outweighs the probative value under *Evid.R.* 4. It is the view of this Court that the same policy concerns expressed in *Gustavson*, which warrant preclusion of evidence of alcohol consumption, absent a showing of unfitness to drive, apply where the work rule violation in question involves precisely the same evidence and thus, the identical potential for being inflammatory and prejudicial. Simply because the accident occurred on the employer's property rather than the public roadway cannot in and of itself justify a deviation from *Gustavson*. While defendants aver that they only seek to introduce evidence of a safety

---

**12.** As part of Conrail and PTL's joint safety program, safety rules are reviewed on a periodic basis. Ironically, one of the safety rules selected and reviewed on the day of the accident for Clement's shift was this Conrail/PTL rule. Clement signed a PTL Supervisory Safety Activity Record which indicates that this rule along with three others were discussed and reviewed.

violation, the obvious effect is to circumvent the *Gustavson* requirements in order to place the same prejudicial material and inferences before the jury.

Defendants cite no case law which supports such a departure from *Gustavson.* However, Conrail does refer the Court to cases involving the violation of safety rules by railroad employees. While the courts in these cases allowed the jury to consider the employees' violations, these cases do not present the same policy concerns outlined in *Gustavson.* Indeed, none of them involved the consumption of alcohol.

The employees in railroad accident cases initiate their lawsuits pursuant to the Federal Employers' Liability Act, ["FELA"], §§ 1–10, 45 U.S.C.A. §§ 51–60. Under FELA, Congress has afforded expansive protection to the railroad employee. Concomitantly, the role of the juror has taken on greater importance, as the cases have focused on whether the employer contributed in any part to the employee's accident. *See Rogers v. Missouri P.R. Co.,* 352 U.S. 500, 508–09, 77 S.Ct. 443, 449–50, 1 L.Ed.2d 493 (1957). Since the railroad employer can be held liable for even the slightest degree of negligence, courts have adopted a liberal approach to admitting evidence of an employee's comparative negligence. Furthermore, the jury's power to engage in inference-drawing is significantly broader than in an ordinary common law negligence action. *Ybarra v. Burlington Northern, Inc.,* 689 F.2d 147, 149 (8th Cir.1982), *citing, Chicago, Rock Island and Pacific Railroad Co. v. Melcher,* 333 F.2d 996, 999 (8th Cir.1964). In the instant case, the basis of liability is ordinary negligence and thus the underlying policies of FELA are not pertinent.

In a case addressing work rule violations that did not arise under FELA, *Marks v. Mobil Oil Corp.,* 562 F.Supp. 759 (E.D.Pa. 1983), the court admitted into evidence the Mobil Driver's Handbook which was issued to each of its drivers and which contained instructions for the operation of the company's vehicles. Each driver signed a receipt indicating that he had received the book and in doing so acknowledged his or her awareness of the standards of safety Mobil required of its drivers. *Marks,* 562 F.Supp. at 769. The plaintiff in *Marks* claimed that the accident was the result of a Mobil driver's failure to observe two safety rules: (1) driving at an excessive speed; and (2) not warning a driver of his intention to pass. *Id.* at 770. The Handbook was ruled admissible since it was relevant on the question of whether the Mobil driver exercised due care and whether the harm caused by the defendant driver's negligence was foreseeable. *Id.* at 769.

Here, while Clement's violation of a safety rule is relevant, this Court nonetheless concludes that this evidence is too prejudicial to admit into evidence. This case differs from *Marks* because of the type of work rule violations present in each case. In *Marks,* the employee was guilty of violating work safety rules which echoed basic safe driving rules of the road. In fact, there was no objection to the Mobil Handbook at trial. *Marks* at 769. In *Marks,* there simply did not exist the potential for inflaming jurors as in the case *sub judice.*

In more basic terms, defendants may not introduce through the back door that which they are not permitted to do directly—admit evidence of alcohol consumption—all under the guise of showing a violation of defendants' work rules. The same prejudice inures to plaintiff from the introduction of this evidence, whether it is offered directly or as proof of a work rule violation. Therefore, the result must be the same: evidence of Clement's alcohol consumption and alcohol levels, demonstrating a violation of defendants' work rules, is inadmissible because defendants have failed to establish through sufficient supplementary evidence that the alcohol rendered Clement unfit to drive.

### III.

■ Lastly, defendants seek to introduce evidence of decedent's consumption of alcohol and a prior incident of reported drug use on the issue of decedent's future earning capacity. The defendants differ in their reasoning why such evidence is relevant. Conrail contends that given the re-

peated violations by Clement of the company anti-alcohol rules, Clement was a "discharge candidate waiting to happen." Therefore, his future with the company was in severe jeopardy. It is PTL's position that the use of alcohol and drugs by the decedent reflect evidence of unfavorable character traits. While PTL does not characterize Clement as a discharge waiting to happen, it does suggest that given the negative implications of these activities, Clement's earning capacity would naturally be adversely affected.

In order to assess the defendants' arguments, it is necessary to review the underlying facts. The drug use relates back to 1984, when Clement admitted to his employer PTL that he used cocaine on a "couple of occasions."[13] To avoid dismissal, Clement entered a company-sponsored rehabilitation program. Clement attended a total of four counseling sessions. No formal diagnosis was rendered nor was any treatment provided. During that time, a urine screen for drugs proved negative. It was recommended that PTL follow up with random urine drug checks to ensure that Clement had indeed ceased using drugs. In May 1983 and again on October 26, 1987, just three days before his fatal accident, urinalysis tests for drugs were negative. The autopsy report also indicated that there were no traces of drugs in Clement's body on the night of his accident.[14] Therefore, other than Clement's admitted use of cocaine three and a half years prior to his death, and the presence of Lidocaine, a substance associated with many household uses, there is no evidence that Clement continued to use drugs after his rehabilitative treatment in 1984.

It is conceded that Clement did consume alcohol. However, the relevant question for purposes of this decision is whether the drinking was so pervasive that it affected his earning capacity or even more broadly, his lifestyle. Defendants do not provide a shred of proof that Clement had a drinking problem, was a habitual drinker, or had experienced even the slightest problem at work or at home as a result of his drinking. But in order to admit evidence of alcohol consumption and the prior drug use it is incumbent upon defendants to bridge the relevancy gap by linking this evidence to decedent's earning capacity or health.

For example, in *Rich v. State,* 171 N.J. Super. 91, 407 A.2d 1281 (Law Div.1979), where drug and alcohol use were admitted into evidence on the question of damages, decedent was in an advanced stage of cirrhosis of the liver, had been hospitalized for his drug addiction including a methadone maintenance program, and had been treated at Martland Medical Center for psychotic manifestations. Unlike Clement, the decedent in *Rich* demonstrated alcohol and drug use dependencies, which clearly impacted upon his health and ability to earn a living.

It is true that it is appropriate for the jury to consider uncertainties, contingencies, and reasonable probabilities in determining whether there is an appropriate basis for awarding pecuniary benefits in a wrongful death case. *McStay v. Przychocki,* 7 N.J. 456, 460, 81 A.2d 761 (1951); *Capone v. Norton,* 21 N.J.Super. 6, 9–10, 90 A.2d 508 (App.Div.1952); *Carianni v. Schwenker,* 38 N.J.Super. 350, 363, 118 A.2d 847 (App.Div.1955); *Gluckauf v. Pine Lake Beach Club, Inc.,* 78 N.J.Super. 8, 21, 187 A.2d 357 (App.Div.1963); *Frasier v. Public Service Interstate Transportation Co.,* 244 F.2d 668, 670 (2d Cir.1957) (applying New Jersey law). However, these imponderables cannot be of a degree which would require the jury to speculate.[15] *Mee-*

---

**13.** Clement had been employed by PTL at its Massachusetts facility when the drug use was reported. He was subsequently transferred to the New Jersey location where he worked until the time of his death.

**14.** The coroner did detect an unspecified amount of Lidocaine. Conrail states, without any supporting expert proof, that Lidocaine is widely used as a cutting agent for cocaine.

However, plaintiff's counsel asserts that Lidocaine is found in such household items as baby powder, powdered sugar and various ointments and sprays.

**15.** While courts are generally unwilling to allow a jury to speculate on a decedent's earning capacity, in the context of deceased *minors,* there necessarily must be some latitude to predict future earnings. In *Gluckauf,* the court found

*han v. Central Railroad Company of New Jersey*, 181 F.Supp. 594, 612–613 (S.D.N.Y. 1960). To avoid unwarranted guesswork there must be proof from which a jury can perform its function. *Melendez v. Rodde*, 176 N.J.Super. 283, 287, 422 A.2d 1047 (App.Div.1980); *See also Meehan*, 181 F.Supp. at 613, *citing, Hirschkovitz v. Pennsylvania R. Co.*, 138 F. 438 (C.C.S.D. N.Y.1905). Similarly, where the admission of infrequent drug use is remote in time it is proper to exclude such evidence. *See Miller v. Alexandria Truck Lines, Inc.*, 273 F.2d 897, 901 (5th Cir.1960).

In *McGrath v. Erie Lackawanna Railroad Co.*, 460 F.2d 1312 (3d Cir.1972), the court found that it would not be overly speculative to allow the jury to consider the likelihood of a promotion for the decedent. There, the plaintiff introduced testimony from a partner in decedent's accounting firm which stated that the decedent was a candidate for Senior Accountant and there was a 100% certainty that he would have been promoted to that level. *McGrath*, 460 F.2d at 1315. The court found that given the fact that this witness was responsible for decedent's promotion, which would have come within four months of his death, there was sufficient proof to allow the jury to consider this reasonable expectation. *McGrath*, 460 F.2d at 1315.

However, absent credible proof of an expectation regarding future earnings, the jury is left only to speculate. In *Rodriquez v. United States*, 823 F.2d 735 (3d Cir.1987), the court found that the district court erred in its finding that the decedent would have obtained future employment as a pilot. Although the decedent had obtained both a private and commercial pilot's license, there was no evidence that the decedent would or could meet whatever remaining qualifications were needed. The court distinguished the cases of *Gilborges v. Wallace, supra; McGrath v. Erie Lack-*

*awanna Railroad Co.*, 460 F.2d 1312 (3d Cir.1972); *Gluckauf v. Pine Lake Beach Club, Inc.*, 78 N.J.Super. 8, 187 A.2d 357 (App.Div.1963), as cases in which credible evidence was presented to support the claimed potential earning capacity of the decedent. *Rodriguez*, 823 F.2d at 749.

The facts here do not permit a reasonable expectation that decedent would have been fired or his earning capacity substantially impaired. The decedent had been continuously employed and the proofs contradict Conrail's characterization of Clement as a man on the verge of unemployment. According to the undisputed evidence, Clement had consistently received pay raises and excellent employment reviews, to the point that he had achieved a supervisory level of employment. Surely, the evidence presents a picture of a hard working company employee rather than a "discharge waiting to happen". Therefore, absent proof that the decedent's discharge was imminent, this Court cannot allow a jury to wander through the web of speculative allegations Conrail has created.

PTL takes a somewhat different view as to why evidence of Clement's prior drug use and alcohol consumption should be admitted. PTL seeks to introduce such evidence to demonstrate an unfavorable character trait. Even assuming such evidence could be labeled as a character trait, PTL's position suffers from the same deficiency as Conrail's proffer. Namely, PTL is unable to affirmatively link decedent's use of alcohol to his potential earning capacity.

It is proper for a jury to factor into its award the decedent's physical, mental and moral characteristics. *Clifford v. McCloskey*, 13 N.J.Super. 96, 98, 80 A.2d 134 (Law Div.1951); *See also Leary v. West Jersey & Seashore Railroad Co.*, 1 N.J.Misc. 549, 146 A. 359 (1923); *Grothe v. St. Louis–San Francisco Railway Co.*, 460 S.W.2d 711,

---

"special circumstances" existed to justify the high verdict since the fifteen year old decedent had a 157 I.Q. and excelled at a school for the gifted. The court stated that "in an action for death of minors all probabilities and every reasonable expectation, bearing upon pecuniary injury should be taken into account". *Gluckauf*, 78 N.J.Super. at 21–24, 187 A.2d 357; *See also,*

*Gilborges v. Wallace*, 153 N.J.Super. 121, 137, 379 A.2d 269 (App.Div.1977), *aff'd* 78 N.J. 342, 396 A.2d 338 (1978). (expert permitted to testify that decedent, a high school senior, would probably become a college graduate, even though the decedent had neither taken any preliminary college boards nor applied for admission to any college).

718 (Mo.1970); *Umphrey v. Deery*, 78 N.D. 211, 48 N.W.2d 897, 909 (1951); *Atlantic Coast Line Railroad Co. v. Daugherty*, 116 Ga.App. 438, 157 S.E.2d 880, 886 (1967); *Collins v. West Plains Memorial Hospital*, 735 S.W.2d 404, 408 (Mo.App.1987). In order to prevent undue prejudice and confusion, the character trait must be linked to an aspect of the decedent's ability to earn money, life expectancy, or to a specific personal claim of dependency. *See Kemp v. Pinal County*, 8 Ariz.App. 41, 442 P.2d 864, 868 (1968); *Gamble v. Hill*, 208 Va. 171, 156 S.E.2d 888, 893–94 (1967).[16]

In *St. Clair v. Eastern Air Lines, Inc.*, 279 F.2d 119 (2d Cir.), *cert. denied*, 364 U.S. 882, 81 S.Ct. 171, 5 L.Ed.2d 104 (1960), Chief Judge Lumbard, in reversing the trial court's admission of evidence of decedent's infidelity and drinking habits, commented that

> [u]ndoubtedly personal habits and qualities are to some degree relevant considerations in determining an individual's earning ability and the support that his family would have received from him but for his death.... [T]hat some aspects of a decedent's character may properly be shown in determining the damages to be awarded in a wrongful death action does not mean, however, that all his habits

and qualities are relevant. The defendant should not be permitted to put in evidence anything he may unearth which reflects unfavorably upon the decedent. *St. Clair*, 279 F.2d at 121.

Here, there is no evidence submitted by PTL to show that the negative character traits of drinking or past drug use, impacted upon Clement's earning capacity or his ability to render services to his family. It is therefore too prejudicial to allow the jury to hear evidence of Clement's alcohol consumption and apparently isolated incidents of drug use.

### IV.

In conclusion, it would be imprudent for this Court to admit the highly prejudicial evidence of decedent's drinking and prior drug use, as it relates to either the issue of liability or damages.[17] Plaintiff's motions to preclude such evidence are granted.

---

16. Courts do, however, appear more willing to admit negative character traits where the decedent has led a criminal life. In *Wimberly v. City of Paterson*, 75 N.J.Super. 584, 183 A.2d 691 (App.Div.), *cert. dismissed*, 38 N.J. 340, 184 A.2d 652 (1962), the only reported New Jersey case found by this Court which deals with the admissibility of a decedent's negative character traits in a wrongful death action, the court allowed defendants to introduce evidence that the decedent, who had been killed by a police officer, had been committed to a juvenile detention center, and that on a prior occasion, he denied his identity and falsely reported his age to a police officer. *Wimberly*, 75 N.J.Super. at 611, 183 A.2d 691.

Similarly, in *Phillips v. Ward*, 415 F.Supp. 976, 981 (E.D.Pa.1975), the decedent had been fatally shot by a police officer and the court allowed defendant to introduce evidence of the decedent's drug use as supported by a 1971 conviction for possession of marijuana, eyewitness testimony of decedent's use, and the autopsy report which revealed the presence of significant amounts of the stimulant phenmetrazine. Defendant also introduced evidence of

the decedent's alleged criminal activity, including: the robbery he was apparently committing when he was killed; his criminal associations; and a criminal complaint that had been issued several weeks before his death. The defendant was allowed to submit the expert testimony of a criminal sociologist who opined that the decedent had the character traits of a career burglar and based on his criminal record and past history of not working, future employability was unlikely. *Id.* at 981.

Notably, there are constraints even on this type of evidence. In *Wimberly*, the court found that it was plain error to admit testimony that the decedent had been *suspected* of committing a number of armed robberies. The absence of any proof that the decedent had been involved in the crimes, convinced the court to reverse the trial court's decision. *Wimberly*, 75 N.J.Super. at 612, 183 A.2d 691. There is no issue of criminality in the case at bar.

17. Bifurcation of the liability and damages phases of trial would not resolve the problem. There are independent bases for excluding this evidence at either stage of the trial.