**Robin STRALEY and Jeannae Straley, his wife, Plaintiffs,**

**v.**

**UNITED STATES of America, Leach Company, a Wisconsin Corporation, EL Industries, Inc., a Delaware Corp., formerly known as Elgin Leach Corporation and also formerly known as Elgin Corp. and SCA Services, Inc., a Massachusetts Corp., Waste Disposal, Inc., a New Jersey Corp., White Bros. Trucking Company, a New Jersey Corporation,**

**Cambria Automotive Companies, Inc., and/or Cambria Mack Trucks, Inc., a New Jersey Corporation, Sanitation Equipment Corp., a New Jersey Corporation, and Mack Trucks, Inc., a Pennsylvania Corporation, Defendants.**

**Civ. No. 92–1056(DRD).**

United States District Court, D. New Jersey.

June 1, 1995.

John B. Collins, Bongiovanni, Collins & Warden, P.C., Denville, NJ, for plaintiffs.

Faith S. Hochberg, U.S. Atty. by Neil R. Gallagher, Asst. U.S. Atty., Newark, NJ, for defendant U.S.

William J. Salmond, Karcher, Salmond, Ronan & Rainone, P.A., Edison, NJ, for defendant Mack Trucks, Inc.

James D. Butler, Jersey City, NJ, for defendants Leach Co. and EL Industries.

George W. Wright, Kroll & Tract, Newark, NJ, for defendant White Bros. Trucking.

Paul J. Endler, Garrubbo & Romankow, Westfield, NJ, for defendant Cambria Mack Trucks.

Gerard M. Green, Green, Caiati & Treitler, Florham Park, NJ, for defendant Sanitation Equipment Corp.

Dennis L. Riley, Riley, Shovlin & Jones, P.A., Clementon, NJ, for defendants SCA and Waste Disposal, Inc.

## OPINION

DEBEVOISE, Senior District Judge.

Plaintiffs submit ten motions in limine. Defendants submit various parallel motions in limine, as well as motions for summary judgment and partial summary judgment. The plaintiffs' first, second, third, fourth, fifth, seventh, and tenth motions in limine will be granted. The plaintiffs' sixth and ninth motions in limine will be granted in part and denied in part. The plaintiffs' eighth motion in limine will be denied.

Furthermore, the motion for summary judgment by defendant White Brothers Trucking Company will be denied in its entirety. The motions for summary judgment by defendants SCA Services, Inc. and Waste Disposal, Inc. will be granted.

## BACKGROUND

On January 15, 1991, the plaintiff, Robin Straley, was working as a garbage collector on a truck owned by Circle Carting, Inc. ("Circle Carting"). Straley and his co-worker, Rodney Gumaer, admit to drinking four 7–ounce beers between 2:00 and 3:00pm on that day. The parties dispute whether that admission is an understatement and whether the men were intoxicated at the time of the accident.

At approximately 3:12pm, Straley was standing on the right rear riding step of the truck while directing Gumaer, who was driving the truck in reverse, down a street between garbage pickups. At the same time, a mail truck was driving up the street, and Straley directed the driver of the mail truck, Thomas Brown, to stop so that the garbage truck could maneuver past. The parties dispute whether the mail truck came to a complete stop.

The maneuver was unsuccessful, and as the garbage truck drove past the mail truck, Straley was either struck from behind by the driver's mirror or slipped while trying to avoid being struck, and fell to the ground whereupon his legs were crushed by the rear wheels of the garbage truck. They were both later amputated about four inches below the knees.

At the accident scene, Gumaer failed a field sobriety test and was noted as smelling of alcohol from three feet, having red and watery eyes, and a "mellow" demeanor. At approximately 5:00pm, Gumaer was given a breathalyzer test, which indicated a blood alcohol content of between .08 and .09%. Although one defense expert concluded that the evidence suggested that Gumaer's alcohol level at the time of the accident was .08%, the other stated that he could draw no opinion as to the exact level. Gumaer ultimately pled guilty in Randolph Township Municipal court to careless driving, improper backing and driving without a license.

Straley was admitted to the Dover General Hospital Emergency Room at 3:53pm. At approximately 4:30pm, blood was drawn from Straley which was found to have a serum alcohol level of .147 percent, which, according to defendants' expert opinion, converts to a true blood alcohol level of approximately .12 percent. Defendants' experts also admit that that level was likely to have been artificially elevated due to Straley's loss of blood.

The plaintiffs instituted this action on March 13, 1992. The amended complaint sets forth five claims, the first sounding in negligence against defendant the United States of America as imputed through the driver of the mail truck. The second count sets forth a related loss of consortium claim by Straley's wife against the United States. The third count alleges that the truck was defective and asserts pendent state law products liability claims against the remaining defendants as being within the chain of distribution and therefore subject to strict liability. The fourth count asserts negligence claims against each of the remaining defendants and alleges that they negligently re-

moved warnings from the truck and that the lack of such necessary warnings was the proximate cause of Straley's injuries. The fifth count asserts a related loss of consortium claim on behalf of Straley's wife against the remaining defendants.

The following facts relate to the chain of distribution of the garbage truck. The chassis and cab of the garbage truck were manufactured in 1979 by defendant, Mack Trucks, Inc. ("Mack"). The truck's garbage compactor was also manufactured sometime in 1979 by Defendant Leach Company ("Leach").

Defendant Sanitation Equipment Corporation ("Sanitation") assembled the garbage truck by combining the chassis manufactured by Mack and the compactor manufactured by Leach. The garbage truck was ordered from Sanitation by SCA Services, Inc. ("SCA") and drop-shipped in October, 1979, to its subsidiary, Waste Disposal, Inc. ("Waste Disposal"). SCA never took title to the truck. Waste Disposal took delivery of the vehicle in Elizabeth, New Jersey, and obtained title as the first owner of the assembled garbage truck on November 17, 1979.

Waste Disposal owned the vehicle until January 14, 1984, when the entirety of its Elizabeth operations, including the garbage truck, was sold to its competitor, White Brothers Trucking Company ("White Brothers"). White Brothers owned the truck until December 23, 1986, when it was sold to Defendant Cambria Mack Trucks, Inc. ("Cambria"). On the same day, Cambria sold the truck to Circle Carting.

It is undisputed that, at the time of the accident, the garbage truck lacked safety decals warning of the dangers posed by riding on the riding step while the truck was being operated in reverse. In 1980, Leach began placing such warning decals at the location of the riding step and providing additional decals for application in the assembled truck cab. Leach claims to have mailed "safety bulletins" to its customers in June of 1986 recommending that such warning decals be added to trucks that did not already display them. Although White Brothers was on a mailing list produced by Leach, it denies having received any safety bulletins. It is undisputed that Leach did not send safety bulletins directly to Circle Carting, the subsequent owner of the truck and Straley's employer.

It is also undisputed that, at the time of the accident, the garbage truck lacked a working backup alarm. Leach claims that since July of 1979, it had installed audible backup alarms on all Leach compactors.

## ANALYSIS

### I. Plaintiffs' Motions in Limine

#### 1. Admissibility of Straley's Alcohol Consumption

The plaintiffs' first motion in limine seeks to bar admission of evidence regarding Straley's consumption of alcohol prior to the accident. Defendants Leach and EL Industries submit a parallel motion to permit the introduction of such evidence in which Sanitation, Mack, SCA and Waste Disposal have joined.

■ Plaintiffs initially argue that under *Rovegno v. Geppert Bros., Inc.*, 677 F.2d 327 (3d Cir.1982), the Third Circuit has held that state law controls the question of whether evidence of alcohol intoxication is admissible. Defendants argue that the Federal Rules of Evidence govern admissibility.

■ In *Rovegno*, the Third Circuit upheld a district court's reliance on Pennsylvania law in excluding such evidence. Relying on its prior decision in *Greiner v. Volkswagenwerk Aktiengeselleschaft*, 540 F.2d 85 (3d Cir.1976), the Third Circuit held that the *Erie* doctrine compelled the application of state law to the question of admissibility of evidence regarding alcohol consumption. *Id.* at 89 (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). Under *Erie*, a federal court sitting in diversity is constitutionally required to apply state substantive law, but looks to federal law as to questions of procedure. *See Witherow v. Firestone Tire & Rubber Co.*, 530 F.2d 160, 163–64 (3d Cir.1976).

■ Federal jurisdiction is invoked in this action, not through diversity of citizenship, but rather under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, as a personal injury claim involving an employee

of the United States. Nevertheless, "[t]he law of the state in which the alleged tort occurred ... governs all substantive issues in a Federal Tort Claims case." *Kruchten v. U.S.*, 914 F.2d 1106, 1107 (8th Cir.1990). Therefore, as under *Erie*, the fundamental question in determining whether state or federal law applies to a particular issue in this action depends on whether the issue is ultimately substantive or procedural. Unfortunately, that question is not always easy to resolve, especially when it relates to the potential admissibility of evidence.

The *Rovegno* court, reviewing the trial court's admissibility decision under an "abuse of discretion" standard, stated,

> Although we are required by our decision in [*Greiner*], to apply [Pennsylvania law] in this appeal, Rule 403 of the Federal Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." We observe that the Pennsylvania decision implicitly requires the same discretionary weighing required by Rule 403. Thus, in interpreting [Pennsylvania law], we may draw on our own decisions dealing with review of Rule 403 exercises.

*Rovegno*, 677 F.2d at 329 (quoting Fed. R.Evid. 403).

The Third Circuit thus upheld the district court's reliance on Pennsylvania law as set forth in *Fisher v. Dye*, 386 Pa. 141, 125 A.2d 472 (1956), which held that, "while proof of intoxication is relevant where reckless or careless driving of an automobile is the matter at issue, the mere fact of drinking intoxicating liquor is not admissible, being unfairly prejudicial, unless it reasonably establishes a degree of intoxication which proves unfitness to drive." *Id.* at 329 (quoting *Fisher*, 125 A.2d at 476).

In his vigorous dissent in *Rovegno*, Judge Van Dusen questioned the need for the majority to refer to the Federal Rules of Evidence if state law exclusively controlled the question of admissibility. *Id.* at 331, 338. Furthermore, he pointed out:

> All of our past decisions on this issue have either assumed or explicitly stated that state law controls the admissibility of evi-

dence of intoxication in a diversity case.... From my reading of these cases, however, the possible applicability of federal law ... was never suggested to or considered by the court.

*Id.* at 338 (Van Dusen, J., dissenting) (citing *Greiner, supra,* among other cases). The only potentially contrary indication he noted was a footnote comment stating that "[t]here is no Federal or state rule of evidence which would permit the testimony as to drinking...." *Id.* (quoting *Rosa v. City of Chester,* 278 F.2d 876, 883 n. 8 (3d Cir.1960)).

Judge Van Dusen went on to point out that at least two circuit courts had concluded that federal law controls the admissibility of evidence of intoxication. *Id.* (citing *Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1153 (5th Cir.1981); *Levitt v. H.J. Jeffries, Inc.*, 517 F.2d 523 (7th Cir.1975) (The First Circuit subsequently joined those circuits, specifically rejecting the analysis in *Rovegno*. *See McInnis v. A.M.F., Inc.*, 765 F.2d 240, 245 & n. 6 (1st Cir.1985)).

He further noted that the Third Circuit had recently ruled that "the Federal Rules of Evidence, and not state law, 'govern the admissibility of documentary evidence in Federal diversity cases.'" *Id.* (citing *Pollard v. Metropolitan Life Ins. Co.*, 598 F.2d 1284, 1286 (3d Cir.1979).

He concluded, "I believe that these cases, as well as a close analysis of what has been called broadly the 'Erie doctrine,' casts substantial doubt on some assumptions concerning the admissibility of evidence in diversity cases which underly our previous decisions." *Id.* Continuing in a footnote, he stated, "Because it is not clear to me whether we have ever actually held—rather than simply assumed—that state law controls, it is equally unclear to me whether we are 'bound' by *Greiner* or any other cases on this issue." *Id.* & n. 21.

The *Rovegno* decision has also been the subject of academic criticism, which has questioned its basis and suggested that the potential applicability of federal law to the question of admissibility may have been overlooked by counsel. *See* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence*

¶ 1101[02] (1994); 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* §§ 5201, 5224 (Supp.1994) ("The Third Circuit has apparently held that in a diversity case the trial court must apply state law in exercising power of discretion exclusion, a questionable result if Rule 403 is properly understood." Wright § 5224 & n. 45 (Supp.1994)).

At least four trial courts have subsequently dealt with the *Rovegno* decision, with some apparent confusion about whether the Third Circuit was directly applying a Rule 403 analysis or merely noting the applicability of Rule 403 decisions given that Pennsylvania law incorporated the same standard.

In *Smith v. Deere & Company*, Civ. A. No. 87–7998, 1989 WL 24903 (E.D.Pa. March 17, 1989), the court began by setting forth the Rule 403 standard and then stated, "In [Rovegno], the Third Circuit, in reviewing the district court's application of F.R.E. 403 where Pennsylvania law applied, held [that evidence corroborating actual impairment was required]." *Id.* at *1. The court continued in a footnote, "In [Rovegno], the Third Circuit observed that Pennsylvania law on the admissibility of evidence of intoxication "implicitly requires the same discretionary weighing required by Federal Rule of Evidence 403." *Id.* at *1 & n. 1. The *Smith* court went on to hold that evidence of a blood alcohol content above the legal presumption of intoxication and an admission of drinking prior to the accident was sufficiently corroborative of impairment to make the evidence of intoxication admissible. *Id.*

In *Kempe v. Dometic Corp.*, 866 F.Supp. 817 (D.Del.1994), the court also set forth the Rule 403 standard, but then went on to cite *Rovegno* as providing, "In a diversity action, the Third Circuit applies state law to determine admissibility of evidence concerning one's alcohol consumption." *Id.* at 819. The court then applied state law to determine the admissibility of evidence of intoxication. *Id.* at 819–21. Likewise, in *Clement v. Conrail*, 130 F.R.D. 530 (D.N.J.1990) (Wolfson, M.J.), Magistrate Judge Wolfson cited *Rovegno* as holding that "in cases brought under diversity jurisdiction, the admissibility of prejudicial evidence is to be decided in accordance with the laws of the state where the district court sits." *Id.* at 532–33.

In *Beirne v. Security Heating–Clearwater Pools*, 759 F.Supp. 1120 (M.D.Pa.1991), the court stated,

> Although the defendant questions the applicability of Pennsylvania common law, we think it clear under the most recent decision by the Third Circuit on this issue, [*Rovegno* ], that Pennsylvania law governs. In [*Rovegno* ], the Third Circuit cited the federal rules of evidence, but based its decision on Pennsylvania precedent.

*Id.* at 1123.

With all of this in mind, there are several possible ways of viewing the Third Circuit's holding in *Rovegno*. Perhaps the most straightforward interpretation would be to read *Rovegno* as requiring the application of state law to determine admissibility of potentially prejudicial evidence, at least with regard to alcohol consumption. Its reference to Rule 403 could therefore be viewed as arising only because Pennsylvania law incorporated that same standard, therefore making the court's Rule 403 decisions relevant, but not necessarily controlling. Although that reading is shared by *Kempe, Clement,* and *Beirne,* it is also the reading that has drawn the most intense criticism, both academic and jurisprudential.

Another potential reading is that the district court's reliance on Pennsylvania's rule regarding admissibility was upheld under an abuse of discretion standard because the Pennsylvania rule was not inconsistent with Rule 403. That reading is arguably more consistent with *Smith,* although *Smith* seems to go somewhat further by characterizing the district court's analysis itself as a Rule 403 analysis.

Given that the court had the benefit of Judge Van Dusen's dissent, however, it seems unlikely that the majority was basing its decision on a Rule 403 analysis under federal law. This is especially true given that the majority addressed Rule 403 only after noting that Pennsylvania law incorporated the same standard, concluding, "Thus, in interpreting [Pennsylvania law], we may draw on our own decisions dealing with re-

view of Rule 403 exercises." *Rovegno*, 677 F.2d at 329. That language supports the conclusion that the majority felt a discussion of Rule 403 was relevant only because Pennsylvania law incorporated the same standard.

Yet another means of analyzing *Rovegno* is presented in Weinstein, *supra*, based on Professor Wellborn's article *The Federal rules of Evidence and the Application of State Law in the Federal Courts*, 55 Tex.L.Rev. 371 (1977), in which the concept of relevancy is broken into two distinct elements. Wellborn states that

> a ruling that an offer of evidence ... is not relevant may mean either (1) that it does not tend—or by application of the principle of rule 403, does not tend sufficiently in light of other effects—to establish the proposition for which it is offered, or (2) that the proposition for which the evidence is apparently offered—or at least one of them—is immaterial, in other words, not provable in the case. A ruling that an offer is relevant means that the evidence satisfied both criteria. Only the first aspect of relevancy is a matter of evidence or procedure; the second aspect is of substantive law....

Weinstein at ¶ 1101[02] (quoting Wellborn at 396). The distinction is therefore between the evidence's probative/prejudicial value, which is procedural and arises under federal law, and materiality, which is a question of substantive, and therefore state, law. *Id.*

Relevancy in defined under the Federal Rule of Evidence by Rule 401, which reads, " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Professor Wellborn suggests that

> [i]n the language of Rule 401, the determinations whether offered evidence has "any tendency to make the existence of" a fact "more probable or less probable than it would be without the evidence" is a matter of entirely federal law; state law governs, in diversity cases, the determination of which facts are "of consequence to the

determination of the action," that is, material.

Weinstein at ¶ 1101[02] (quoting Wellborn at 396).

Applying that analysis to *Rovegno*, Weinstein states,

> in order to determine whether a federal court must apply the Pennsylvania rule on the admissibility of blood alcohol results, a federal judge would have to ask: does Pennsylvania exclude blood alcohol results in the absence of "other evidence" because drinking, standing alone, is not probative of a degree of intoxication which proves unfitness to drive, or does the Pennsylvania rule mean that drinking is not a material proposition that is provable to show negligence? As Professor Wellborn's article demonstrates, it is frequently difficult to ascertain whether a particular rule is "only evidentiary or is meant to prescribe rights and obligations of the parties not related to factfinding."

*Id.*

Therefore, if *Rovegno* could be read as requiring the application of state law because of the materiality of an issue, as opposed to the potential prejudice of evidence offered to prove that issue, it could potentially be reconciled with other circuit decisions and overcome current criticisms.

Turning back to the holding in *Rovegno*, the Third Circuit had determined that it was bound by its decision in *Greiner* to apply Pennsylvania law to the question of admissibility. But before the court in *Greiner* even discussed the Pennsylvania rule, it stated, "[*Erie* ] compels us to follow the law of Pennsylvania." *Greiner*, 540 F.2d at 89. There was no apparent consideration, therefore, of potential distinctions between materiality and probativeness as the basis for state law application. Furthermore, the court's subsequent discussion of the state law rule illustrated that it has been adopted in Pennsylvania because "[o]nly such evidence supporting an inference of unfitness due to intoxication is sufficient to outweigh possible prejudice." *Id.* It is therefore clear from the precedent upon which the *Rovegno* court relied that the application of state law was directly on the

issue of the probative/prejudicial value of the evidence, not its materiality.

Although defendants argue that the current interpretations of *Rovegno* are incorrect, I am compelled to join the other trial courts in this circuit in concluding that, on the question of admissibility of alcohol consumption, it requires the application of state law rules on admissibility. Although that distinction may turn out to be more academic than practical, it nonetheless governs the format of my analysis.

■ Under New Jersey law, as with Pennsylvania law, evidence of consumption of alcohol is deemed inadmissible as unfairly prejudicial unless coupled with evidence tending to show actual impairment. The leading case on point is *Gustavson v. Gaynor*, 206 N.J.Super. 540, 503 A.2d 340 (App.Div.1985), in which the court held,

> The mere fact that a driver had consumed some alcoholic beverages is by itself insufficient to warrant an inference that the driver was intoxicated and that the intoxication was of such a degree as to render him unfit to drive at the time of the accident. The admission of such testimony without supporting evidence is unduly prejudicial in view of its capacity to inflame the jury.

*Id.* at 545, 503 A.2d 340.

Applying that standard, the court held that a driver's veering two or three feet out of his lane was not so erratic as to suggest probable intoxication and therefore was not sufficient supporting evidence to permit testimony on the driver's prior consumption of alcoholic beverages. *Id.* at 545–46, 503 A.2d 340.

The evidence was therefore excluded under New Jersey's former Evidence Rule 4 because "its probative value was substantially outweighed by the potential for undue prejudice created by its admission." *Id.* at 543, 503 A.2d 340. Although New Jersey's rules of evidence were amended in 1993 to mirror the federal rules, there is no functional change in the standard for exclusion of relevant but prejudicial evidence. New Jersey's current Rule of Evidence 403 states, "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury...." N.J.R.Evid. 403.

In *Clement,* Magistrate Judge Wolfson applied *Gustavson* and the analogous cases it considered, including cases from Pennsylvania, to determine that evidence of even an extremely high blood alcohol content was not sufficiently corroborative of unfitness to drive to justify introduction of evidence of alcohol consumption. *Clement,* 130 F.R.D. at 534–35. It was noted, however, that the alcohol level considered in *Clement* was below the .10% level of legal intoxication in New Jersey and that recent case law in Pennsylvania had given greater weight to that state's adoption of the .10% legal intoxication standard. *Id.* at 535 & n. 8. *Gustavson* held that although there was no rigid standard for factors satisfying the supplementary evidence requirement for unfitness to drive, factors that have been considered include excessive drinking, driving at excessive speed, reckless or erratic driving, and drunken behavior at the accident scene. *Id.* at 535 (citing *Gustavson,* 206 N.J.Super. at 545, 503 A.2d 340, citing in turn, *Rovegno,* 677 F.2d at 330–31).

■ Whether operating under the Federal Rules of Evidence or New Jersey's version thereof, the first question that has to be asked is whether the evidence offered is relevant. Rule 401 defines relevant evidence as being probative of a fact which is of consequence to the determination of the action, in other words, evidence that helps to prove or disprove a fact, which in turn, helps to resolve an issue which is material to the case. *See* N.J.R.Evid. 401; Fed.R.Evid. 401. As discussed above, Professor Wellborn believes that the materiality of an issue arises from state law, whereas the probativeness of evidence remains the province of federal law. As I have already concluded, the Third Circuit requires the application of state law to both elements, at least with regard to evidence of alcohol consumption.

The next step in the evidentiary framework involves Rule 402, which is again functionally the same under the Federal and New Jersey Rules of Evidence. The rule states that except as otherwise provided by law or

rule, relevant evidence is admissible. *See* N.J.R.Evid. 402; Fed.R.Evid. 402.

The next step is Rule 403 of either set of rules, which, as discussed above, allows the exclusion of relevant evidence if its probative value is substantially outweighed by the risk of unfair prejudice or other negative effects. *See* N.J.R.Evid. 403; Fed.R.Evid. 403. Again, as discussed above, Professor Wellborn and other circuits believe this discretionary exclusion principle to be the sole province of federal law, whereas the Third Circuit, at least with regard to evidence of alcohol consumption, requires the application of state law.

With that framework in mind, it is important to note that before the question of potentially unfair prejudice via Rule 403 can even be considered, it must first be determined whether the evidence is relevant under Rule 401. Satisfying Rule 401 involves three basic questions: (1) What is the issue for which the evidence is offered; (2) Is that issue material to the case; and finally, (3) Is the evidence probative of the issue?

Although the plaintiffs argue in their moving brief that evidence of Straley's alcohol consumption should be barred for lack of corroborative evidence of intoxication (a Rule 403 argument), they fail to identify the issues for which the evidence might be offered or otherwise discuss the relevancy of the evidence.

The United States contends that the evidence is relevant because Straley's carelessness is at issue. (Def. United States Opp'n Br. at 1.) Count one of the plaintiffs' complaint sets forth a claim for personal injury due to the alleged negligence of the driver of the mail truck. (Am.Compl. ¶¶ 1–7.) The United States contends that "[t]he evidence in this case is clearly sufficient to permit the jury to fairly infer that plaintiff was intoxicated and that the intoxication was a contributing factor to his accident." (Def. United States Opp'n Br. at 7.)

That statement contains three functional contentions: first, that Straley's intoxication is an issue material to the negligence claim, in that it goes to contributory or comparative negligence (Rule 401); second, that the evi-

dence offered is probative of that issue (Rule 401); and finally, that its probative value outweighs the danger of unfair prejudice (Rule 403).

As far as the United States is concerned, therefore, the evidence is relevant because it is probative of Straley's intoxication, and intoxication is an issue material to the claim of negligence. To the extent the cases relied upon by the United States discuss materiality and probativeness, they are not directly on point because they involve automobile accidents and claims of driver or pedestrian negligence. Here, Straley was not the driver of an automobile; rather, he was riding on a garbage truck and directing it in reverse. Nonetheless, the activities are sufficiently analogous, involving factors such as coordination, observation and reaction in a vehicular context, that intoxication remains material to the issue of negligence. Furthermore, evidence of alcohol consumption is probative of intoxication and therefore relevant under Rule 401.

The next step, however, requires a determination as to whether otherwise relevant evidence should be excluded due to the possibility of unfair prejudice under Rule 403. This is where New Jersey's corroboration requirement comes into play with regard to evidence of alcohol consumption.

The proposed evidence regarding Straley's intoxication includes:

1. Straley's admission of drinking four 7–ounce beers within the hour preceding the accident;

2. Detection of the odor of alcohol on Straley's breath by two police officers, a doctor and a nurse;

3. Straley's .147 serum blood alcohol level results;

4. Expert conclusions regarding Straley's potential impairment, actual consumption, and blood alcohol content.

The plaintiffs contend that none of this evidence is sufficient under *Gustavson* to show that Straley was actually impaired at the time of the accident. Both the admission of drinking and smell of alcohol would be barred under *Gustavson* as unfairly prejudi-

cial without corroborating evidence of actual impairment.

Additionally, plaintiffs point out that defense experts admit Straley's blood alcohol reading is likely to have been artificially high as a result of his blood loss following the accident. Furthermore, they note that the experts admit that, even based on that reading, it was likely that Straley's blood alcohol content was below .10% at the time of the accident.

Although a clear showing that Straley's blood alcohol content at the time of the accident was above the .10% standard for legal intoxication might satisfy *Gustavson*'s corroboration requirement, the evidence presented in this case is insufficient to do so. Furthermore, there is no on-the-scene evidence that Straley was actually impaired at the time of the accident. Rather, the driver of the mail truck stated that he watched Straley negotiate a snowbank while emptying garbage cans with no apparent difficulty immediately before the accident.

I therefore conclude that, although relevant to the issue of negligence, the probative value of the evidence of Straley's alcohol consumption is outweighed by its potential for unfair prejudice under N.J.R.Evid. 403 and New Jersey law. Additionally, if I were applying the Federal Rules of Evidence and federal law, I would reach the same conclusion and bar the evidence as unfairly prejudicial.

The plaintiffs' first motion in limine will therefore be granted with respect to Count One of the Amended Complaint setting forth a claim for personal injury due to negligence against the United States.

Defendant Leach additionally argues that the evidence is relevant to the issue of proximate causation with regard to the claims against it. As I will explain in sections four and five below, Straley's negligence is irrelevant to the products liability claims because he was using industrial machinery in the workplace and such evidence is precluded in that context. Even if the evidence were relevant to proximate causation, however, it would still be barred because it is not sufficiently corroborative of actual impairment and, therefore, its probative value is substantially outweighed by its potential for unfair prejudice.

Accordingly, the plaintiffs' first motion in limine will be granted. Motions by defendants to the contrary will be denied.

*2. Admissibility of Gumaer's Alcohol Consumption*

■ The plaintiffs' second motion in limine seeks to bar the admission of evidence of Gumaer's alcohol consumption. Defendants Leach and EL Industries submit a parallel motion to permit the introduction of such evidence in which Sanitation, Mack, SCA and Waste Disposal have joined. In keeping with the evidentiary framework outlined above, the first step in the analysis is determining the issues for which the evidence is offered. As I will explain in section six below, Gumaer's negligence is only relevant to the issue of whether his negligence was the supervening cause of the accident.

For the same reasons as discussed above, however, the proposed evidence with regard to Gumaer is not legally sufficient to corroborate actual impairment and, therefore, its probative value is substantially outweighed by the danger for unfair prejudice.

Although Gumaer was noted by the police officer performing the field sobriety test as having a mellow demeanor, smelling of alcohol from three feet, and having red and watery eyes, none of those factors is sufficiently corroborative of actual impairment to justify introducing the evidence. Plaintiffs point out that Gumaer was crying at the scene of the accident as an explanation for his red and watery eyes. Furthermore, although small deviations were noted by the officer in Gumaer's performance of the various components of the field sobriety test, such as slight swaying from side to side during a walking test, none of those deviations is significant enough to justify an inference of actual impairment. (Pls.' Br. at 17–19; United States' Opp'n Br. at 7–9.) A field sobriety test is not, in itself, a sufficiently reliable and scientific means of measuring the influence of alcohol to overcome the fact that Gumaer tested below the legal level of intoxication. Rather, the test is merely a

means of establishing probable cause for an arrest prior to more detailed and accurate testing for evidence of legal intoxication.

Like Straley, if Gumaer had tested above .10% blood alcohol content, that evidence might be sufficient under *Gustavson* to corroborate actual impairment and justify the introduction of evidence of his prior consumption of alcohol. Because he tested below that level and because no other legally sufficient evidence corroborative of actual impairment is available, the evidence is inadmissible.

The plaintiffs' second motion in limine will therefore be granted. Defendants' motions to the contrary will be denied.

### 3. Admissibility of Gumaer's Motor Vehicle Offense Pleas

■ The plaintiffs' third motion in limine seeks a ruling that Gumaer's municipal court guilty pleas to motor vehicle offenses are not admissible in this action. The pleas were entered in accordance with New Jersey Court Rule 7:4–2(b), which provides that "upon the request of the defendant the Court may at the time of the acceptance of a plea of guilty order that such plea shall not be evidential in any civil proceeding...." *Id.* Accordingly, an order barring the use of Gumaer's guilty pleas in civil matters was entered by the Honorable Andrew T. Shaw, J.M.C., on February 27, 1991. (Pls.' Br.App. Ex. C.)

Orders limiting the evidential use of such pleas are granted as a matter of course in consideration of "the often-informal nature of municipal court proceedings and the varied reasons why people plead guilty without intending to incur the collateral consequences of the plea: time constraints; inability to secure witnesses or not wanting to disturb them for a small matter; unease with court proceedings, etc." *State v. LaResca*, 267 N.J.Super. 411, 421, 631 A.2d 986 (App.Div. 1993).

The defendants contend that the order should be disregarded because Judge Shaw failed to abide by an additional requirement of Rule 7:4–2(b) that the court

shall not accept such a plea without first addressing the defendant personally and determining by inquiry of the defendant and of others in the court's discretion that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea and that there is a factual basis for the plea.

N.J.R. Ct. 7:4–2. The defendants refer to the transcript of the brief hearing in which Gumaer's guilty plea was entered and note that at no time did the court address Gumaer personally to assess the voluntariness of his plea. (Leach's Opp'n Br. Ex. F.) However, in consideration of the informal nature of municipal court proceedings and the reality that the personal inquiry requirement is for the protection of the accused, I find no compelling reason to disregard Judge Shaw's order. Gumaer's voluntariness in entering the pleas is not at issue.

Accordingly, the plaintiffs' third motion in limine will be granted.

### 4. Availability of the "Open and Obvious Danger" Defense

■ The plaintiffs' fourth motion in limine seeks to preclude the defendants from asserting New Jersey's statutory "open and obvious danger" products liability defense. This defense is a component of the larger question posed by the plaintiffs' fifth motion on the availability of a contributory/comparative negligence defense. The defense is set forth in N.J.S.A. 2A:58C–3(a), which provides,

In any product liability action against a manufacturer or seller for harm allegedly caused by a product that was designed in a defective manner, the manufacturer or seller shall not be liable if: ... (2) The characteristics of the product are known to the ordinary consumer or user, and the harm was caused by an unsafe aspect of the product that is an inherent characteristic of the product and that would be recognized by the ordinary person who uses or consumes the product with the ordinary knowledge common to the class of persons for whom the product is intended, except that this paragraph shall not apply to industrial machinery or other equipment

used in the work place and it is not intended to apply to dangers posed by products such as machinery or equipment that can feasibly be eliminated without impairing the usefulness of the product....

N.J.S.A. 2A:58C–3(a).

The plaintiffs contend that the defense is unavailable to the defendants because the garbage truck in question was "industrial machinery or other equipment used in the work place" or that the danger posed could have been eliminated without impairing the truck's usefulness.

The New Jersey legislature established this defense in an effort

> to establish clear rules with respect to specific matters as to which the decisions of the courts in New Jersey have created uncertainty, while reserving the concept that manufacturers may be held strictly liable for harm caused by products that are defective.... In particular, sections 2 through 4 are not intended to affect the holding in *Suter v. San Angelo Foundry & Machine Company,* 81 N.J. 150 [406 A.2d 140] (1979), with respect to the application of the principle of comparative fault in cases involving workplace injuries.

Sen. Judiciary Cmte. Statement, Senate, No. 2805–L.1987, c. 197.

Under *Suter,* the New Jersey Supreme Court limited situations in which contributory, and thereby, comparative negligence defenses could be raised in the strict liability context. *Suter* overturned an earlier case, *Cepeda v. Cumberland Engineering Co., Inc.,* 76 N.J. 152, 386 A.2d 816 (1978), which had upheld a contributory negligence defense based on the plaintiff's use of a workplace machine which he knew was missing a necessary handguard. The *Suter* court rejected that rationale, deciding that "the law does not accept the employee's ability to take care of himself as an adequate safeguard of interests which society seeks to protect." *Suter,* 81 N.J. at 167, 406 A.2d 140.

In rejecting *Cepeda,* the court expanded the effect of its holding in *Bexiga v. Havir Manufacturing Corp.,* 60 N.J. 402, 290 A.2d 281 (1972), which precluded a contributory negligence defense "where an employee is injured due to a defect ... in an industrial accident while using a machine for its intended or foreseeable purposes." *Suter,* 81 N.J. at 168, 406 A.2d 140. The holding in *Bexiga* was premised on the public policy assertion that a worker engaged at his assigned task in operating a dangerous piece of machinery has no "meaningful choice" in the matter, but must work without complaint or be labelled a troublemaker. *Tirrell v. Navistar Intern. Inc.,* 248 N.J.Super. 390, 401, 591 A.2d 643 (App.Div.1991). The court thereby rejected *Cepeda*'s holding that contributory negligence can be raised when the employee knew of the risk posed by the machine, but nonetheless chose to expose himself to it.

The exception to the statutory defense based on industrial machinery used in the workplace therefore embodies the principle of *Bexiga* as expanded by *Suter* that an "open and obvious danger" defense should be unavailable with regard to workers using industrial machinery in the workplace.

The defendants argue that because Straley had significant latitude in the manner in which he performed his work, that somehow the exception should not apply to him. I find that argument unconvincing. Rather, Straley was using a piece of industrial machinery, namely the garbage truck, in his workplace, which in this case was the streets of the city. The definitions of both industrial machinery and workplace must encompass the many contexts in which modern workers are engaged in their labors. *See Tirrell,* 248 N.J.Super. at 401, 591 A.2d 643 (holding that a highway construction site was a workplace).

The defendants are therefore precluded from the "open and obvious danger" defense of N.J.S.A. 2A:58C–3(a) and the plaintiffs' fourth motion in limine will be granted.

### 5. Comparative Negligence as a Defense

The plaintiffs' fifth motion in limine seeks to bar assertions by the products liability defendants that Straley was comparatively negligent either by using the riding step or in the manner in which he directed the garbage truck.

Many of the parties' arguments regarding this motion are redundant of those

set forth above. Defendants again argue that Straley voluntarily encountered a known risk and that the context of the accident doesn't constitute a "workplace" under N.J.S.A. 2A:58C–3(a) or associated case law. As I have already held, however, the context of Straley's work did constitute a workplace. Accordingly, and as stated above, no defense of comparative negligence may be raised to the products liability claims based on assertions of Straley having encountered the known risk of the riding step.

Defendants also contend that Straley's alcohol consumption takes his use of the machinery out of the context of that for which it was intended. I have already determined, however, there is insufficient evidence to show that Straley was intoxicated at the time of the accident, and as such, that evidence is barred.

Finally, defendants contend that the nature of Straley's actions went beyond merely encountering the known risk of the riding step in that he was negligent in the manner in which he directed the garbage truck. That assertion has no relevance to this matter. "[I]n a workplace products liability action the issue is confined to whether the product was defective and, if so, whether the defect rendered the product unfit for its intended or reasonably foreseeable purposes." *Glendenning v. WGM Safety Corp., Inc.,* 795 F.Supp. 720, 723 (D.N.J.1992) (holding that contributory negligence in the workplace is irrelevant, even if the employee had arguably safer options for using the product). The bottom line is that Straley was using industrial machinery in the workplace. Allegations that he acted negligently in that activity, whether by encountering the known risk of the riding step or by improperly directing the garbage truck in reverse, are barred by N.J.S.A. 2A:58C–3(a).

The plaintiffs' fifth motion in limine will therefore be granted.

### 6. *Apportionability of Gumaer's Negligence*

■ The plaintiffs' sixth motion in limine seeks to bar consideration of the issue of Gumaer's negligence in apportioning liability among the parties. Plaintiffs argue that the New Jersey Workers' Compensation Act bars claims against Gumaer or his employer for Straley's employment-related injuries. N.J.S.A. 34:15–8.

Under the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A–1, *et seq.,* a joint tortfeasor may sue for contribution from other joint tortfeasors, defined as "two or more persons jointly or severally liable in tort for the same injury." N.J.S.A. 2A:53A–1. In *Ramos v. Browning Ferris Industries,* 103 N.J. 177, 510 A.2d 1152 (1986), the New Jersey Supreme Court held that

> the Workers' Compensation Act removes the employer from the operation of the Joint Tortfeasors Contribution Law. Because the employer cannot be a joint tortfeasor, it is not subject to the provisions of the Joint Tortfeasors Contribution Law, and a third-party tortfeasor may not obtain contribution from an employer, no matter what may be the comparative negligence of the third-party and the employer.

*Id.* at 184, 510 A.2d 1152.

■ Furthermore, under the Comparative Negligence Act, N.J.S.A. 2A:15–5.1 *et seq.,* assessment of liability is limited to those who are parties to the suit. *See Ramos,* 103 N.J. at 193, 510 A.2d 1152 (citing N.J.S.A. 2A:15–5.2(b); *Jarrett v. Duncan Thecker Assocs.,* 175 N.J.Super. 109, 113, 417 A.2d 1064 (Law Div.1980)).

Therefore, because Gumaer or his employer are not a party to the suit and cannot be considered joint tortfeasors, Gumaer's negligence cannot be considered by the jury on the issue of comparative negligence. Defendants concede that point, but assert that "there is a considerable difference between having the jury assess and determine their percentage of negligence and the defendants arguing Rodney Gumaer's negligence as the proximate cause of the accident." (Def. Leach's Opp'n Br. at 19.) Defendants fail, however, to cite any case law for that contention and offer no further argument to support it.

■ Nonetheless, there does appear to be support for the defendants' position. Although a party may be insulated by law from liability as a joint tortfeasor, that par-

ty's negligence may be considered a "supervening" cause of the damage if 100% of the damage can be causally attributed to it. For example, in *Sears, Roebuck & Co. v. Huang*, 652 A.2d 568 (Del.1995), defendants to a claim that a child had injured its hand on an escalator argued that parental negligence was the supervening cause of the injury. The trial court granted a motion in limine precluding such evidence because the parent was immune from liability under the state's doctrine of parental immunity and therefore could not be considered a joint tortfeasor.

The Delaware Supreme Court reversed, holding that although the parent may be immune from liability as a joint tortfeasor, defendants were nonetheless entitled to argue that the entire cause of the accident was attributable to parental negligence. "If the parent's negligence was a supervening cause of the child's injury, the named defendants' negligence would be a remote cause, rather than a proximate cause, and the defendants would not be liable as tortfeasors." *Id.* at 572. If, however, any portion of the damage could be attributed to the non-immune parties, then the parent ceases to be a supervening cause and the defendants become wholly liable for the damage. *Id.* at 572–73.

New Jersey courts have likewise recognized superseding causation as a viable defense in products liability actions.

> Even if defendant had tried to shift responsibility to the employer and claimed that the employer's conduct was the sole proximate cause of the accident, such an "empty chair defense" is not improper.... [it] merely focuses the jury's attention upon the plaintiff's duty to prove that defendant's conduct or defective product was a proximate cause of the accident.

*Fabian v. Minster Machine Co., Inc.*, 258 N.J.Super. 261, 276, 609 A.2d 487 (App.Div. 1992) (citing *Brown v. United States Stove Co.*, 98 N.J. 155, 171, 484 A.2d 1234 (1984) (holding that extensive misuse of a heater was supervening cause of injuries; design defect was only remote, and therefore not proximate, cause)).

The plaintiffs' motion will therefore be granted as to the issue of comparative negligence, but denied as to the issue of superven-ing causation. Defendants will be allowed to introduce evidence of Gumaer's negligence in an effort to prove that it was the sole proximate cause of Straley's injuries. As stated above, however, unless the jury determines that his negligence bears a 100% causal relationship to the injuries, the issue of supervening causation will be destroyed and his negligence will cease to be relevant. If so, the jury will be left to apportion all damages among the defendants, without consideration of Gumaer's comparative negligence.

### 7. Application of N.J.S.A. 2A:58C–1 to Cambria Mack Trucks, Inc.

The plaintiffs' seventh motion in limine seeks a determination that defendant Cambria Mack Trucks, Inc. was a "seller" of the garbage truck within the meaning of the New Jersey Products Liability Act. The statute provides:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

N.J.S.A. 2A:58C–2.

Cambria claims that it acted merely as a broker between White Brothers and Circle Carting and therefore falls outside the scope of liability imposed by the statute. As the sole foundation for it's assertion, it cites *Oscar Mayer Corp. v. Mincing Trading Corp.*, 744 F.Supp. 79, 82–83 (D.N.J.1990), which held that a spice broker was not responsible to its principal for latent defects in a shipment of defective peppercorns. Cambria argues that because it never inspected or took physical possession of the garbage truck and did not negotiate the price between White Brothers and Circle Carting, that it acted merely as a broker to the transaction.

Although Cambria was, in a certain sense, an "intermediary" between White Brothers and Circle Carting, it was not so peripheral to the garbage truck's chain of distribution as to be considered a mere broker between the parties.

> A "broker" is one whose duty is to bring parties together and he is, in effect, a go-between whose responsibility it is to effect an agreement between the parties.... "Properly speaking, a broker is a mere negotiator between the other parties, and he never acts in his own name, but in the names of those who employ him...."

*Martins Ferreira v. Jayess Corp.*, 214 F.Supp. 723, 727 (D.N.J.1963) (citations omitted) (quoting *Story on Agency*, § 28). Rather than serving merely as an agent for the sole purpose of assisting White Brothers and Circle Carting in forming an independent contract, Cambria actually took title to the truck in its own name before it was transferred to Circle Carting. In doing so, it transcended the role of a mere broker by acting in its own name as an independent legal entity.

Cambria could best be defined as a dealer in new and used garbage trucks, taking in trade-in trucks and reselling them to other parties. Transactions of this type were common between White Brothers and Cambria, in which Cambria supplied hundreds of garbage trucks over the course of the past 25 years and took back old trucks as trade-ins. Although Cambria resold the garbage truck to Circle Carting on the same day it took title to it, that convenience of timing cannot erase the fact that Cambria held legal title to the truck on December 23, 1986. Nor can the fact that Cambria never took physical possession of the truck negate the fact of its ownership or subsequent placement of the truck into the stream of commerce. *See Weber v. Johns–Manville Corp.*, 630 F.Supp. 285, 288 (D.N.J.1986) (the requirement that a defendant have control of a product does not "impose an absolute 'hands on' requirement.")

The plaintiffs' seventh motion in limine will therefore be granted.

### 8. The Burden of Coming Forward with Evidence of Non-liability

█ The plaintiffs' eighth motion in limine seeks to take advantage of rules developed under New Jersey law which allow the shifting of certain evidentiary burdens, and in some cases the entire burden of proof, to defendants in an action. Those decisions revolve around the traditional doctrine of *res ipsa loquitur* and its modern expansion to situations involving multiple defendants and theories of liability other than negligence.

Under the traditional doctrine, a plaintiff could establish an allowable inference of negligence on the part of a defendant by showing that "(a) the occurrence itself ordinarily bespeaks negligence, (b) the instrumentality was within the defendant's exclusive control, and (c) there is no indication that the injury is attributable to plaintiff's voluntary act or neglect." *Rose v. Port of New York Authority*, 61 N.J. 129, 136, 293 A.2d 371 (1972). The doctrine "is simply an emanation of the basic legal doctrine that a verdict in a negligence case may rest on circumstantial evidence." *Lorenc v. Chemirad Corp.*, 37 N.J. 56, 70, 179 A.2d 401 (1962). The plaintiff's satisfaction of a *prima facie* case does not establish liability, but rather, provides threshold evidence upon which a jury could permissibly base a determination that the defendant was negligent. The burden of persuasion therefore remained with the plaintiff, although the burden of production shifted to the defendant to come forward with evidence explaining why he was not actually negligent. If the evidence produced by the defendant were of such weight that a reasonable jury could not reach a determination of liability, then the defendant would be entitled to a directed verdict. Otherwise, the question would go to the jury.

In some very limited situations, courts have held that the inference of liability of defendants is so clearly established by the circumstances of the *prima facie* case that both the burdens of production and persuasion should shift to the defendants to exonerate themselves by a preponderance of the evidence. The plaintiffs rely on such a case, *Anderson v. Somberg*, 67 N.J. 291, 338 A.2d 1 (1975), *cert. denied*, 423 U.S. 929, 96 S.Ct.

279, 46 L.Ed.2d 258 (1975), although they do not distinguish between the burdens of production and persuasion, and refer merely to shifting the burden of proof, which encompasses both concepts. (Pls.' Br. at 62.) In *Anderson,* plaintiff suffered injuries when a metal forceps used during a spinal operation broke, leaving metal embedded in the spinal canal which had to be removed by subsequent surgery. Claims for products liability and negligence were brought against the manufacturer and surgeon, respectively. The court discussed the case in the context of the doctrine of *res ipsa loquitur,* noting that the doctrine had been expanded substantially over time to embrace situations involving multiple defendants and theories of liability. *Id.* at 299–300, 338 A.2d 1. That expanded application of the doctrine has "more accurately been called 'akin to *res ipsa loquitur'* or 'conditional *res ipsa loquitur.'*" *Id.* at 300, 338 A.2d 1 (citations omitted).

The court discussed such a conditional *res ipsa loquitur* case, *NOPCO Chem Div. v. Blaw–Knox Co.,* 59 N.J. 274, 281 A.2d 793 (1971), which held that

> when several defendants individually owe plaintiff a duty, and all might have caused his loss and have superior knowledge of the occurrence, they all are bound to come forward and give an account of what happened. In that case, the application of *res ipsa loquitur* was thought to call for an explanatory rather than an exculpatory account, according to the traditional rule.

*Anderson,* 67 N.J. at 300, 338 A.2d 1; *see also Jackson v. Magnavox Corp.,* 116 N.J.Super. 1, 7, 280 A.2d 692 (App.Div.1971) ("Where it is virtually certain that one of two defendants is responsible for plaintiff's injuries, and the evidential key as to which it is, is peculiarly within the knowledge of defendants, it is fair that the defendants be called upon to furnish information upon the basis of which the jury can determine the responsible party."). The decision embodied the traditional *res ipsa loquitur* principle that the burden of production shifts to the defendant following the plaintiff's satisfaction of a prima facie case although the plaintiff retains the ultimate burden of persuasion. *Id.*

*Anderson* went even further, however, and announced that the unique facts of the case created such a strong presumption of liability on the part of the defendants that both the burdens of production and persuasion should shift to the defendants to exculpate themselves by a preponderance of the evidence. *Id.* The court was careful to limit its holding to the unique facts of the case, in which

> an unconscious or helpless plaintiff suffers an admitted mishap not reasonably foreseeable and unrelated to the scope of the surgery (such as cases where foreign objects are left in the body of the patient), those who had custody of the patient, and who owed him a duty of care as to medical treatment, or not to furnish a defective instrument for use in such treatment can be called to account for their default.

*Id.* at 298, 338 A.2d 1; *see also Huddell v. Levin,* 537 F.2d 726, 746 (3d Cir.1976) (Rosenn, J., concurring) ("The holding in *Anderson* may be restricted to instances in which the plaintiff suffered injury while an unconscious hospital patient."); *Shackil v. Lederle Laboratories,* 116 N.J. 155, 173, 561 A.2d 511 (1989) ("That approach, which could conceivably be characterized as one of 'alternative liability' has not been duplicated in any New Jersey case since *Anderson.* It is limited to one (1) factual context.")

The plaintiffs argue that each entity in the chain of distribution is present as a defendant, that the truck was defective because it lacked a functioning backup alarm at the time of the accident, that Straley was injured as a result of that defect, and because knowledge relating to the alarm is peculiarly within the possession of the defendants, the burden of proof should shift to them to exonerate themselves.

It is clear that the facts of this case, however, fall far short of the unique circumstances giving rise to *Anderson*'s justification for shifting the entire burden of proof to the defendants. That holding has been recognized as limited to a single factual situation not presented by this case, *Shackil,* 116 N.J. at 173, 561 A.2d 511, and this case is not sufficiently analogous to justify application of the *Anderson* principle. In fact, an examination of the circumstances of this case shows

that it falls short of justifying even an application of traditional *res ipsa loquitur.*

This is not the type of case in which it is clear that the plaintiff would not have been injured but for the negligence of defendants or the defectiveness of their product. Nor is it a virtual certainty that one of the several defendants before the court is liable for the plaintiff's injuries leaving only the question of which one. Rather, there are significant issues relating to both causation and the underlying theories of liability that are not so clearly in the plaintiff's favor as to justify application of the doctrine of *res ipsa loquitur.*

The question of whether a backup alarm was installed is only one of several factors that could lead a jury to determine that the product in question was defective or that the defendants were negligent. However, even if a jury were to reach such a conclusion, they might still determine that the plaintiffs have failed to establish a causal link between the defendants' actions and the plaintiff's injuries. The issues presented by the backup alarm are therefore not simply relevant to an allocation of clear liability, but rather, are deeply imbedded in the existence of liability itself. The plaintiffs have therefore failed to establish that this situation normally bespeaks negligence (or products liability), nor have they established a clear causal link between the alleged actions of the defendants and Straley's injuries. Accordingly, they have failed to establish circumstances justifying the application of the doctrine of *res ipsa loquitur,* thereby shifting the burden of production to the defendants.

The plaintiffs' eighth motion in limine will therefore be denied.

### 9. Admissibility of ANSI Standards and Post-manufacture Warnings

The plaintiffs' ninth motion in limine seeks a ruling on the admissibility of evidence relating to defendants Leach and Mack's continuing duty to warn customers of dangers posed by their product and discovered following its manufacture. Specifically, they argue that evidence of ANSI standards developed after manufacture should be admissible as relevant to defendants' knowledge of dangers posed, and that post-manufacture warning letters should be admissible as relevant to whether the defendants satisfied their duty to warn.

Leach disputes the admissibility of such evidence, while Mack disputes whether it was under a continuing duty to warn. I will address Leach's assertions first.

Under N.J.S.A. 2A:58C–4,

> In any product liability action the manufacturer or seller shall not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction or, in the case of dangers a manufacturer or seller discovers or reasonably should discover after the product leaves its control, if the manufacturer or seller provides an adequate warning or instruction.

*Id.*

 Leach initially argues that warning letters it sent regarding the use of backup alarms and dangers posed by using the riding step while the truck is moving in reverse should be barred as evidence of subsequent remedial measures under Fed.R.Evid. 407. The rule provides,

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control or feasibility of precautionary measures if controverted, or impeachment.

*Id.* Rule 407 is clearly not applicable to this case, however, as the "event" in question is the accident, and the warnings were mailed prior to the accident. *Dixon v. Jacobsen Mfg. Co.,* 270 N.J.Super. 569, 587, 637 A.2d 915 (App.Div.1994) (construing applicability of N.J.Evid.R. 51, precursor to current N.J.R.Evid. 407, both analogs to Fed.R.Evid. 407.) ("Hence, the Rule would not be a bar to admissibility of remedial measures, such as the warning labels or safety instructions ... issued by defendant after the date of

manufacture, but prior to the date of the 'event' (plaintiff's accident).").

■ Leach also argues that evidence of ANSI standards developed following the manufacture of the truck would violate Fed. R.Evid. 403 as being more prejudicial than probative because the evidence might lead the jury to believe that the design of the truck at the time of its manufacture was not "state of the art." I find that argument unpersuasive. With regard to issue of whether the product was defective, the defendants are entitled to the defense that the design of the product was the state of the art at the time of its manufacture. That defense is embodied in N.J.S.A. 2A:58C–3a(1) and prohibits liability if

> [a]t the time the product left the control of the manufacturer, there was not a practical and technically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the product....

*Id.; see also Seeley v. Cincinnati Shaper Co., Ltd.,* 256 N.J.Super. 1, 14, 606 A.2d 378 (App.Div.1992), *certif. denied,* 130 N.J. 598, 617 A.2d 1220 (1992). Such a defense does not exist, however, with regard to a party's continuing duty to warn. Furthermore, the issues of state of the art manufacture and continuing duty to warn are sufficiently delineable that a jury is unlikely to confuse them if properly instructed. The probative value of the evidence is therefore not substantially outweighed by its prejudicial effect so as to preclude its admissibility under Rule 403. The plaintiffs' motion will therefore be granted as to Leach.

■ Mack opposes the motion by asserting that, as the manufacturer of the multipurpose truck chassis, it had no continuing duty to warn regarding hazards posed by subsequent changes to the vehicle, such as its transformation into a garbage truck. It cites *DePrimo v. Lehn and Fink Products Company,* 223 N.J.Super. 265, 538 A.2d 461 (Law Div.1987), for the proposition that

> [c]ertainly a manufacturer has a duty to warn of the dangers that are inherent in the use or foreseeable use of its product. *Michalko v. Cooke Color and Chemical*

*Corporation,* 91 N.J. 386, 451 A.2d 179 (1982). However, this Court concludes that where a manufacturer's product is just one (1) component of a system, its duty to warn is limited to the duty to warn only of the dangers of its product's use in the system.

*Id.* at 272, 538 A.2d 461. Plaintiffs contend that the defendants had a continuing duty to warn of dangers posed by operating the truck in reverse without a backup alarm or while someone was riding on the riding step. The riding step, however, was not an element of the chassis manufactured by Mack. Rather, it was part of the compactor manufactured by Leach, the two components being later assembled by Sanitation Equipment. Courts have held that it is unreasonable to impose a duty upon a manufacturer to warn of all possible dangers posed by all possible uses of a product because such "billboard" warnings would deprive the user of an effective warning. *Andre v. Union Tank Car Company, Inc.,* 213 N.J.Super. 51, 67, 516 A.2d 277 (Law Div.1985) ("To warn of all potential dangers would warn of nothing."). It seems clear, therefore, that as far as the riding step is concerned, the chassis merely constituted a component of the finished truck and did not include the element which the plaintiffs claim gives rise to a duty to warn. Furthermore, imposing a duty to warn upon Mack for all possible uses of its chassis, including the those for which a backup alarm is necessary, would result in ineffective "billboard" warnings.

Mack therefore had no relevant continuing duty to warn and the plaintiff's ninth motion in limine will be denied with respect to it.

## 10. Legal Sufficiency of Warning Letters

■ The plaintiffs' tenth motion in limine seeks a ruling that Leach's mailing of warning letters is insufficient as a matter of law to satisfy its continuing duty to warn. Plaintiffs cite *Coffman v. Keane Corp.,* 133 N.J. 581, 606, 628 A.2d 710 (1993), for the proposition that "New Jersey Law requires that a manufacturer o[r] supplier of products that are used by employees take reasonable steps to ensure that its warnings reach[ ] those employees." (Pls.' Br. at 77.) *Coffman,* in turn,

states that "a manufacturer cannot escape its duty to employees by 'merely sending a warning letter and a new [safety device] to be installed on the machine.'" *Coffman*, 133 N.J. at 606, 628 A.2d 710 (quoting *Seeley*, 256 N.J.Super. at 14, 606 A.2d 378).

Leach attempts to distinguish *Seeley* as a case involving only a manufacturer's obligation to correct a design defect as distinguished from its continuing duty to warn. An examination of cases upon which both *Seeley* and *Coffman* relied, however, suggests that that distinction is not as crucial as Leach purports.

In one of those cases, *Stephenson v. R.A. Jones & Co., Inc.*, 103 N.J. 194, 510 A.2d 1161 (1986), the court held that a "manufacturer that knows its machines are defective has a duty to employees of the purchaser to correct the defect and may not rely on the purchaser-employer to make the necessary correction." *Id.* at 200, 510 A.2d 1161 (citing *Michalko v. Cooke Color & Chem. Corp.*, 91 N.J. 386, 400, 451 A.2d 179 (1982)). *Michalko* itself, which was also independently cited by both *Seeley* and *Coffman*, held that "a manufacturer is under a duty to warn owners and foreseeable users of the dangers of using a particular machine if, without such a warning, the machine is not reasonably safe." *Michalko*, 91 N.J. at 403, 451 A.2d 179. Furthermore, *Michalko* pointed out that a duty to warn arises, in the same way as a duty to correct a design defect, because without adequate warnings, a product is deemed defective. *Id.* at 402, 451 A.2d 179 (citing *Beshada v. Johns–Manville Corp.*, 90 N.J. 191, 208–09, 447 A.2d 539 (1982); *Freund v. Cellofilm properties*, 87 N.J. 229, 239–41, 432 A.2d 925 (1981)).

■ The holdings in *Seeley* and *Coffman* are therefore not logically limited to a manufacturer's duty to correct a physical design defect, but include *Michalko*'s recognition that inadequate warnings are themselves a design defect. The crucial distinction between the two is that a manufacturer has no duty to correct a physical design that was considered state of the art at the time of its manufacture, whereas it does have a duty to warn of dangers in its product exposed by advances in the state of the art. *Seeley*, 256 N.J.Super. at 14–15 & n. 7, 606 A.2d 378.

■ *Seeley*'s holding that sending a warning letter and a corrective component to an employer was legally insufficient to satisfy its duty to correct design defects is therefore properly recognized through *Coffman* as applying both to its continuing duty to warn and to correct physical design defects. Therefore, where a physical correction is not required because the original design was considered state of the art, a manufacturer is still under a continuing duty to warn foreseeable users of its product and cannot legally satisfy that duty by merely sending warning letters to an employer. Although Leach's position would be defensible if there were a greater duty to warn of dangers posed by a state of the art product than those exposed through advances in the state of the art, no such distinction is apparent in the case law. Furthermore, such a distinction would seem contrary to the public policy justification for a imposing a continuing duty to warn, that being "because a warning could make [the product] safer at virtually no added cost without limiting its utility." *Michalko*, 91 N.J. at 402, 451 A.2d 179 (quoting *Beshada*, 90 N.J. at 201, 447 A.2d 539).

Leach claims to have sent warning letters to customers including Sanitation Equipment, but admits that it was unaware of the existence of Circle Carting and therefore sent it no letters. (Pls.' Br. at 75; Leach's Opp'n Br. at 28–29.) Even if it had sent letters to Circle Carting, however, it still would have failed as a matter of law to satisfy its continuing duty to warn foreseeable users of dangers posed by its product.

The plaintiff's tenth motion in limine will therefore be granted with respect to Leach.

## II. Defendants' Motions for Summary Judgment
### SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary mate-

rial of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), *rev'g,* 723 F.2d 238 (3d Cir.1983). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Co. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir.1976), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The mere existence of some alleged factual dispute between the parties, however, will not otherwise defeat a properly supported motion for summary judgment. *Id.* at 247–248, 106 S.Ct. at 2509–10.

### ANALYSIS

*1. White Brothers*

Defendant White Brothers asserts three points in its motion for summary judgment: (1) that it was not a "seller" of the garbage truck within the meaning of N.J.S.A. 2A:58C–1 and is therefore entitled to summary judgment on the plaintiffs' products liability claims; (2) that its alleged negligence could not have been a proximate cause of Straley's injuries and that it is therefore entitled to summary judgment on the plaintiffs' negligence claims; and (3) that in the alternative, the testimony of plaintiffs' investigator Al Cafferata should be barred at trial.

■ Although strict products liability applies to a party "engaged in the business" of selling a product which is defective, such liability does not apply to an occasional seller not engaged in the activity as a regular part of its business. *Acevedo v. Start Plastics, Inc.,* 834 F.Supp. 808, 811 (E.D.Pa.1993); *Santiago v. E.W. Bliss Div., Gulf & Western Mfg. Co.,* 201 N.J.Super. 205, 216, 492 A.2d 1089 (App.Div.1985); *Restatement (Second) of Torts* § 402A & Comment F (1965).

■ White asserts that its purchase of the garbage truck in question was merely an occasional sale and that the sale of used trucks is not a regular part of its business. The plaintiffs counter, however, that three years following White's purchase of the truck from Waste Disposal for $32,000, it traded in the truck to Cambria and received $33,000 in credit toward the purchase of new vehicles. Cambria, in turn, sold the truck to Circle Carting. The plaintiffs assert that White has engaged in more than 200 similar transactions with Cambria and that its accrual of economic benefits from those transactions is significant and regular enough to make it a "seller" for purposes of products liability.

Neither party has succeeded in providing case law that resolves its position as a matter of law in light of the facts of this case. Rather, this is clearly a situation in which the characterization of White's activities is within the proper province of the jury. White's motion for summary judgment on the plaintiffs' product liability claims will therefore be denied.

■ As to the negligence claims, White argues that its alleged negligence could not be deemed the proximate cause of Straley's injuries because even if it was negligent in failing to add or maintain a backup alarm, the subsequent owners' failure to do the same would constitute a superseding cause of the injuries. (White's Moving Br. at 13 (citing *Restatement, supra,* § 452(2)).)

The plaintiffs point out, however, that subsequent supervening causes, including the negligence of a third party, will not serve to break the chain of causation if those causes are foreseeable to the originally negligent party. (Pls. Opp'n Br. at 16.); *Torsiello v. Whitehall Laboratories,* 165 N.J.Super. 311,

327, 398 A.2d 132 (App.Div.1979), *certif. denied,* 81 N.J. 50, 404 A.2d 1150 (1979). The foreseeability of such intervening causes is properly a jury question. *Id.*

Because the foreseeability of subsequent negligence cannot be resolved as a matter of law based on the facts of this case, the issue is a jury question and White's motion for summary judgment on the plaintiffs' negligence claims will therefore be denied.

■ Finally, in the alternative to its summary judgment motions, White contends that the testimony of the plaintiffs' investigator, Al Cafferata, should be barred as violative of Fed.R.Evid. 401 or 403. Plaintiffs intend to call Cafferata as a rebuttal witness to challenge the credibility of White's president, Vincent Apice. At his deposition, Apice stated that when White purchased the truck in question, it did not contain warning decals. (Pls.' Opp'n Br. at 20.) Apice additionally stated that he had never seen a decal warning of the dangers posed by the riding step on any truck manufactured by Mack or Leach and that he was unaware of the existence of such a decal on any truck owned by White. (*Id.* at 20–21.)

Cafferata intends to testify that one month after Apice's deposition, on May 13, 1993, he photographed nineteen garbage trucks entering or leaving White Brothers, each of which had a Leach compactor and every one of which bore a warning decal above the right rear riding step. White contends that the testimony should be excluded under Fed. R.Evid. 401 as irrelevant because it fails "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* The plaintiffs' point out, however, that the evidence is relevant to Apice's credibility because White denies receiving any safety bulletins from Leach regarding the need for affixing warning decals to the garbage trucks and the need for functioning backup alarms. Apice's credibility is at issue on this point and that the proposed testimony is relevant for that reason. A jury could permissibly construe the testimony as detracting from Apice's credibility on an issue relevant to the case.

White next contends that the evidence should be excluded as unfairly prejudicial under Fed.R.Evid. 403. I find no convincing basis for that assertion. White avoids the fact that the presence of the decals on so many trucks directly calls into question the credibility of its president's assertion that he was unaware of such decals. Accordingly, the testimony will not be barred.

White's motion will be denied in its entirety.

## 2. SCA and Waste Disposal

Defendant SCA argues that, as the parent corporation of Waste Disposal, it merely ordered the garbage truck in question to be drop shipped to its subsidiary, never took title or possession of the truck, and therefore cannot be considered a "seller" under N.J.S.A. 2A:58C–1 as a matter of law.

Waste disposal itself claims that by selling its entire Elizabeth operation to White, including the truck in question, it was acting merely as an occasional seller and that the nature of its activities cannot be considered those of a seller as a matter of law.

Both entities further argue that the plaintiffs' claims against them are barred by the two-year personal injury statute of limitations set forth in N.J.S.A. 2A:14–2. Finally each argues that the truck never violated any of the ANSI standards during its ownership and that no warning letters were received during its ownership.

■ Although the plaintiff argues that by ordering the truck on behalf of its subsidiary, SCA somehow entered the chain of distribution, there seems little basis for so holding. Rather, its actions were far more analogous to those of a broker, discussed in section seven above, in that it merely arranged for the transaction between two parties and never took title to the truck in its own name. Accordingly, SCA's motion for summary judgment will be granted with respect the products liability claims against it.

■ As to Waste Disposal, the plaintiff argues that it is common in the garbage collection industry for larger companies to resell their used trucks to smaller companies

resulting in a "trickle down" effect. Based entirely on that assertion, the plaintiffs essentially argue that Waste Disposal's mere existence in the garbage collection industry is sufficient to conclude that it was a "seller" within the meaning of the products liability law. (Pls.' Opp'n Br. at 29–30.) Such an argument completely ignores the distinction between an occasional seller and one for which such sales are a regular part of its business.

Waste Disposal has come forward on its motion with evidence explaining the nature of its business and the sale of its Elizabeth operations to White Brothers sufficient to establish that it was an "occasional seller" of garbage trucks. The plaintiffs and other parties in opposition to the motion have failed to come forward with specific evidence that the sale of garbage trucks was a sufficiently regular part of its business to establish a genuine issue of material fact as to whether it was a "seller" within the meaning of the products liability law.

Accordingly, Waste Disposal's motion for summary judgment will be granted with respect to the products liability claims against it.

### CONCLUSION

For the reasons set forth above, there is insufficient evidence under New Jersey law to establish that Straley or Gumaer were actually impaired as a result of their consumption of alcohol prior to the accident. Therefore, the probative value of evidence of their consumption of alcohol is substantially outweighed by the danger for unfair prejudice and such evidence will be barred. Accordingly, the plaintiffs' first and second motions in limine will be granted.

Gumaer's guilty pleas to motor vehicle offenses are subject to a proper order precluding their use as evidence in a civil matter and therefore, the plaintiffs' third motion in limine will be granted. Straley's use of the garbage truck constituted the use of industrial machinery in the workplace and the defendants are therefore not entitled to an "open and obvious danger" or comparative negligence defense. Accordingly, the plaintiffs'

fourth and fifth motions in limine will be granted.

Although defendants cannot argue the comparative negligence of Gumaer in apportioning liability among them, they may permissibly argue that Gumaer's negligence was the supervening cause of Straley's injuries. Accordingly, the plaintiffs' sixth motion in limine will be granted with respect the issue of comparative negligence, but denied with respect to supervening causation. The nature of Cambria's activities was such that they constitute a "seller" within the meaning of New Jersey products liability law and, therefore, the plaintiffs' seventh motion in limine will be granted.

The plaintiffs have failed to establish circumstances bringing into play the doctrine of *res ipsa loquitur* and, accordingly, their eighth motion in limine will be denied. The plaintiffs have established that evidence of ANSI standards and post-manufacture warning letters is relevant with regard to Leach's duty to warn and that such evidence is not unduly prejudicial. However, they have failed to establish Mack's duty to warn. Accordingly, the plaintiff's ninth motion in limine will be denied with respect to Mack and granted with respect to Leach. Finally, the plaintiffs have established that Leach's mailing of warning letters did not satisfy its continuing duty to warn and their tenth motion in limine will therefore be granted.

Additionally, it cannot be resolved as a matter of law whether defendant White Brothers' activities made them a "seller" within the meaning of the product liability law. Accordingly, its motion for summary judgment will be denied. However, the nature of defendants SCA and Waste Disposal activities is sufficiently clear that it can be concluded as a matter of law that they were not "sellers" within the meaning of the products liability law. Accordingly, their motions for summary judgment will be granted with respect to the products liability claims against them.

An appropriate order follows.